[Civ. No. 55869. Second Dist., Div. Four. Apr. 24, 1980.]

VIRGINIA HERNANDEZ, Plaintiff and Appellant, v.
ATLANTIC FINANCE COMPANY OF LOS ANGELES et al.,
Defendants and Respondents.

66

**COUNSEL**

Kenyon F. Dobberteen and Cary S. Reisman for Plaintiff and Appellant.

Richard A. Elbrecht, A. Paul Griebel, Joseph Garcia, Roger Dickinson, Kathleen E. Doyle and Laura W. Kaplan as Amici Curiae on behalf of Plaintiff and Appellant.

Styskal, Wiese & Melchione, Alvin O. Wiese, Jr., and Michael D. Finnegan for Defendants and Respondents.

## OPINION

**WOODS, J.**—In this appeal we are called upon to decide whether the conduct of a used car dealership and a finance company in arranging for financing for the purchase of automobiles violates the Rees-Levering Automobile Sales Finance Act. That act (Civ. Code, §§ 2981-2990) regulates the sale and financing of automobiles. At issue is whether the method of automotive financing engaged in here is covered or exempted by the provisions of the act.

Plaintiff, Virginia Hernandez, brought suit on behalf of the general public against defendants Atlantic Finance Company and Espinosa Auto Sales. Plaintiff's complaint alleges that defendant Espinosa solicits and obtains prospective purchasers for the sale of his used motor vehicles; that Espinosa contacts defendant Atlantic to determine whether and on what terms Atlantic will extend credit to Espinosa's prospective customers; that Espinosa assists the prospective purchasers in obtaining loans from Atlantic; that Atlantic lends money to said purchasers, writing a personal loan, rather than a conditional sales contract, and takes as security the purchaser's furniture and other personal possessions in addition to the automobile being purchased. The complaint alleges that such financing is expressly forbidden by the Rees-Levering Act; that it constitutes an illegal and unfair business practice and is enjoinable pursuant to the provisions of section 3369 of the Civil Code.[1] The complaint alleges that among the provisions of the Rees-Levering Act which are violated by the foregoing financing arrangements, are the following: The established maximum interest rate which may be imposed by the financing agency; the requirement that all elements of the sale and financing transaction be contained on a single document; the requirement that a security interest may be retained only in the

---

[1]The provisions of Civil Code section 3369 are now found at Business and Professions Code section 17204.

purchased automobile; the authorization to buyers that they may assert, against the financing agency, any defenses they may have against the seller; and the allowance of an extended redemption period following repossession.

Following a court trial, judgment on the merits was granted pursuant to Code of Civil Procedure section 631.8, in favor of defendants. The court found that defendants have not engaged in any unfair or deceptive practices "which constitute a scheme or design to deprive consumers nor impaired consumers of the rights secured to them and to the general public by the provisions of the Personal Property Brokers Law or the Rees-Levering Automobile Sales Finance Act...." The court ordered that no injunction issue against either defendant, and this appeal followed.

### The Rees-Levering Act

The Rees-Levering Automobile Sales Finance Act became effective January 1, 1962. The act replaced the 1945 Automobile Sales Act and was designed to provide a more comprehensive protection for the unsophisticated motor vehicle consumer.[2] Soon after its enactment, the California Supreme Court declared: "'..."The obvious purpose of the statute is to protect purchasers of motor vehicles against excessive charges by requiring full disclosure of all items of cost" [citation]; the form and requisites prescribed by the statute are mandatory; a contract which does not *substantially* conform thereto is unenforceable; and a buyer who has made payments to the seller under such a contract may recover them....'" (*Stasher v. Harger-Haldeman* (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649]; italics in original.)

The act contains the following provisions, inter alia, all clearly designed to protect the purchaser of a motor vehicle from the economic hazards which the Assembly Interim Committee on Finance and Insurance and the courts had found prevalent under the old act. (See, e.g.,

[2] 15 Assembly Interim Committee Reports No. 24, Finance and Insurance Report, page 7, 1 Appendix to Journal of the Assembly (1961 Reg. Sess.): "The sale of automobiles is particularly important because of the very size, for the great majority of families, of the economic decision involved in the purchase of an automobile. Such a purchase is second in importance to a family only to the purchase of a home....

"A family which finds itself unhappily entwined in a transaction involving an automobile is too often likely to find itself embroiled in other economic and domestic difficulties as well. For example, federal bankruptcy referees in Los Angeles, where in 1960 the number of filings for bankruptcy exceeded that of any previous year, estimate that 88 percent of all bankruptcies are wage earners who have made installment purchases with little or no down payment."

*Tri-City Credit Bureau* v. *Brimmer* (1960) 182 Cal.App.2d 321 [6 Cal. Rptr. 107]; *Foster* v. *Masters Pontiac Co.* (1958) 158 Cal.App.2d 481 [322 P.2d 592]; *City Lincoln-Mercury Co.* v. *Lindsey* (1959) 52 Cal.2d 267 [339 P.2d 851, 73 A.L.R.2d 1420].) The act provides that every conditional sales contract shall disclose to the buyer all details concerning the sale, financing, and complete costs of the purchase of the motor vehicle. Eighteen separate items are specified for disclosure. The act requires that all of the terms and agreements must be contained in a single document, and sets a maximum interest rate chargeable for the financing of the automobile. (Civ. Code, § 2982.) The act requires at least 15 days' written notice of intent to dispose of a repossessed vehicle and allows recovery of a deficiency judgment by the lender only if all notice requirements are complied with. (Civ. Code, § 2983.2.) The act authorizes a buyer to reinstate the contract after repossession, without acceleration of the total balance owing. (Civ. Code, § 2983.3.) It further provides that the lender is subject to all equities and defenses of the buyer against the seller, notwithstanding any agreement to the contrary. (Civ. Code, § 2983.5.) It limits the security which may be taken by the lender to the motor vehicle being purchased. A lien on any other real or personal property is unenforceable. (Civ. Code, § 2984.2.)

█ Respondents asserted below and contend here that although the transactions complained of do not conform to the requirements of the Rees-Levering Act, they are exempt from its provisions by virtue of Civil Code section 2982.5. That section provides in part: "(a) Nothing contained in this chapter shall be deemed to affect a loan, or the security therefor, between a purchaser of a motor vehicle and a supervised financial organization, other than the seller of the motor vehicle, all or a portion of which loan is used in connection with the purchase of a motor vehicle."

Appellant argues that that section was designed to exempt only private financing obtained independently by a motor vehicle purchaser; that it was not designed to exempt seller-assisted loans. We agree with appellant. To adopt respondents' position would be to accept a construction of the exemption which devours the act.

### Standing to Institute These Proceedings

█ In the demurrers and motions for summary judgment filed below, respondents challenge appellant's standing to bring the subject

lawsuit. It is established by the pleadings and by the evidence presented at trial that plaintiff did not purchase an automobile from defendant Espinosa Auto Sales; neither did she borrow nor attempt to borrow money from Atlantic Finance Company. Her action is brought on behalf of the general public pursuant to Business and Professions Code section 17204. The issue of plaintiff's standing to maintain the action was not resolved in the court below. At the conclusion of trial, the court executed findings of fact and conclusions of law and stated at conclusion number 5: "Based upon the foregoing findings of fact and conclusions of law the Court finds it unnecessary to reach or determine the question of whether plaintiff has standing to maintain this action on her own behalf, or on behalf of the general public pursuant to the provisions of § 17200 et seq. of the Business and Professions Code."

 Respondents contend that the issue of appellant's standing to sue is not properly before us, no decision thereon having been reached in the trial court. Appellant appears to agree with this contention; we do not. The issue of appellant's standing to sue is a threshold issue which must be resolved before this matter can be reached on its merits. If we were to conclude that plaintiff did not have standing to maintain the action, not having been personally damaged by the defendants' conduct, then there would be no need to address the merits of her cause. Equally wasteful of judicial resources would be a resolution on the merits without reaching the standing issue. We have concluded that defendants' conduct is in violation of the Rees-Levering Act and is properly subject to injunction. To reach such a conclusion without ordering that such injunction issue would be an idle act. "'The rendering of advisory opinions falls within neither the functions nor the jurisdiction of this court. [Citations.]'" (*Younger* v. *Superior Court* (*Mack*) (1978) 21 Cal.3d 102, 119-120 [145 Cal.Rptr. 674, 577 P.2d 1014].)

Business and Professions Code section 17200 et seq., govern actions for unfair competition and unlawful, unfair or fraudulent business practices. Section 17204 provides: "Actions for injunction pursuant to this chapter may be prosecuted by the Attorney General or any district attorney or any city attorney . . . in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person acting for the interests of itself, its members or the general public."

 Defendants argue below that this section does not enlarge the number of persons who may seek injunction to prevent unlawful busi-

ness practices, and that traditional concepts of standing must be read into the statute. Respondents point out that no cases have been litigated under this section wherein the plaintiff, suing on his own behalf and as a public attorney general, was not personally damaged by the conduct sought to be enjoined. Our research, too, has failed to disclose any such cases. However, we read the statute as expressly authorizing the institution of action by any person on behalf of the general public. The Legislature has provided that suit may be brought by any person acting in his own behalf *or* on behalf of the general public.

■ Nor is an action on behalf of the general public, prosecuted by a private attorney general, to be confused with a class action, wherein damage to the representative plaintiff is required. In *People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10, at page 17 [141 Cal.Rptr. 20, 569 P.2d 125], the Supreme Court explained: "An action filed by the People seeking injunctive relief and civil penalties is fundamentally a law enforcement action designed to protect the public and not to benefit private parties. The purpose of injunctive relief is to prevent continued violations of law . . . ." And at page 18, footnote 7, the court observed: "Individual actions are aimed at recovery of money and are usually based upon the theories of fraud or breach of contract. Reliance and actual damages must be shown. In an action by the People, on the other hand, only the violation of statute is necessary to justify an injunctive relief and civil penalties."

In *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, at page 110 [101 Cal.Rptr. 745, 496 P.2d 817], the California Supreme Court said of Civil Code section 3369 (a predecessor section to Bus. & Prof. Code, § 17204, containing identical language): "'[T]he section demonstrates a clear design to protect consumers as well as competitors by its final clause, permitting inter alia, any member of the public to sue on his own behalf or on behalf of the public generally. If the Legislature had been solely concerned with protection against the evil of unfair competitive advantage, it would certainly have more narrowly circumscribed the class of persons permitted to institute such actions.'" (Fn. omitted.)

■ Although the language in the foregoing cases is necessarily dictum as it relates to the issues before us, it is instructive in evaluating the scope of the statute. Nothing in the legislative history of this section nor in the manner in which it has been interpreted by the courts reflects

an intention to narrowly circumscribe the class of persons who may seek injunction under its terms. The language of the statute authorizing an action on one's own behalf or on behalf of the general public allows the instant suit by Virginia Hernandez. Throughout the proceedings below and on appeal, she has standing to maintain this action.

## SUMMARY OF THE FACTS

Virginia Hernandez testified at the trial of the within action that in October 1975, she and her mother went to Espinosa Auto Sales, looking for a used car. They expressed interest in a car, and a salesman named Mario took them for a test drive and then filled in a credit application form for Virginia Hernandez's mother. At that time, her mother's income consisted of $100 per month from motel management, $80 per month from apartment management, and $160 per month in welfare benefits. The witness told the salesman that they wanted to look other places for other cars and that they would be in touch with him. The next morning the salesman called Ms. Hernandez at her mother's home, told her "that the credit had gone through" and asked her to come in and sign the papers. She told him she was not sure they wanted the car and that she would talk to her mother about it. The salesman said he would call back. The salesman called her again about an hour later and asked her to come and pick up the car. She repeated that she was still not sure about whether they would purchase it, and said she would call him later. The salesman called her again the same day, repeated that the credit had gone through, that it was getting late and that "they were going to close the place where she had to sign the papers." Ms. Hernandez told the salesman they did not have transportation and the salesman offered to come and pick them up. He then came to her home and drove her and her mother to the auto dealership. Her mother signed some papers there. The salesman then said they had to go to Atlantic to sign more papers. The salesman drove them to Atlantic Finance and introduced them to one of Atlantic's employees. Her mother signed more documents there. All of the documents signed by Virginia Pineda, the witness' mother, were introduced in evidence. The financing agency required that the witness' mother put up both her furniture and the new automobile as security for the loan. After the documents were signed, Mario drove them back to Espinosa Auto Sales.

Shortly after the vehicle was purchased, the witness had difficulty with it and she returned the car to the seller. She subsequently received

a notice of sale from Atlantic Finance, giving her 11 days' notice of the intended sale of the vehicle.

The foregoing testimony offered by the plaintiff was uncontradicted. The remaining evidence in the record consists of stipulated facts, answers to requests for admissions, the testimony of Dagoberto Espinosa, and the declaration of W. M. Roof, president of Atlantic Finance Company. That evidence establishes that defendant Atlantic Finance Company of Los Angeles is a personal property broker doing business in East Los Angeles and that it is a "supervised financial organization" as defined in the Rees-Levering Act. Defendant Dagoberto Espinosa, doing business as Espinosa Auto Sales, is a used car dealer doing business in East Los Angeles. At various times, defendant Espinosa will contact defendant Atlantic Finance to determine whether Atlantic Finance will extend credit to Espinosa's prospective purchasers of automobiles. Atlantic may agree to purchase a conditional sales contract from the auto dealer. Or Atlantic may agree to extend a personal loan directly to the purchaser. When a loan is made directly to the purchaser, a check is issued by Atlantic, payable to Espinosa, for the full purchase price of the vehicle, less the down payment. Those loans are governed by the California Personal Property Brokers Law (Fin. Code, § 22000 et seq.) and not by the Rees-Levering Act. Often the finance charges exceed the maximum amount allowed under the Rees-Levering Act. In all cases where a loan is made for the purpose of acquiring an automobile, Atlantic takes additional security in the form of other tangible personal property, in addition to the motor vehicle purchased. In the event of default on the buyer's personal loan, Atlantic proceeds with repossession and sale under the provisions of the Personal Property Brokers Law and not the Rees-Levering Act.

Espinosa testified that approximately 63 percent of his cars are sold pursuant to seller-assisted personal loans from finance companies. The decision whether to sell the car on a conditional sales contract and later assign the contract to a lending institution, or to send the buyer directly to the lending institution for a personal loan, is based on the credit worthiness of the buyer. A buyer with low income and a very small down payment is unlikely to qualify for a conditional sales contract, and that buyer will be issued credit, if at all, only on a personal loan secured by property in addition to the car. When Espinosa submits credit applications to Atlantic, those applications are often hand carried from the auto dealership to the lending institution; prospective purchasers are

frequently driven by Espinosa's employees to the lender for purposes of effectuating the loan.

## DISCUSSION

As the foregoing facts demonstrate, when a personal loan is issued to a prospective purchaser of an automobile, numerous provisions of the Rees-Levering Act are not complied with. Interest is charged which is in excess of the maximum allowed by law; mandatory disclosures are not made to the buyer; additional security is taken to assure repayment of the loan; more than one document is used in connection with the sale and loan; and the buyer is deprived of protection on default and repossession. Each of the foregoing provisions was designed to protect the consuming public. The question presented is whether a transaction of the nature described herein, hereinafter referred to as a seller-assisted personal loan, is exempt from the requirements of the statute.

As previously noted, the exemption from the act, set out in Civil Code section 2982.5, subdivision (a), exempts a loan between a purchaser of a motor vehicle and a supervised financial organization. Respondents contend that the language of that exemption expressly excludes from the coverage of the act loans of the nature under discussion here. It is appellant's position that this exemption was enacted to cover only privately obtained personal loans, i.e., a loan obtained independently by a purchaser from his bank or credit union. It is appellant's position that the Rees-Levering Act was not designed to protect the sophisticated buyer, capable of arranging his own financing, but to protect the unwary naive purchaser who is the victim of financing arrangements controlled jointly by the seller and lender. The legislative history of the Rees-Levering Act supports appellant's position.[3] All of the evils discussed in the Interim Finance Committee Report, *supra*, and sought to be remedied by the Rees-Levering Act were those wherein both the seller of the vehicle and the financing agency were involved in arranging for long-term payment for the vehicle purchased.

---

[3]"It was possible to evade the [Automobile Sales Act] by use of the dealer participation agreement. In one type of dealer participation transaction, the buyer and seller agree upon the absolute sale of a vehicle. The seller then calls in a finance company to loan the buyer the purchase price, the seller receiving full payment and the finance company arranging the payment terms and security. Thus, the finance company becomes a lender subject to the usury law rather than a seller covered by the ASA's stricter requirements. If the joint venture analysis is applied, the [Rees-Levering Act] single-document requirement may possibly end this evasive practice since the transac-

While it is true that the language of section 2982.5, subdivision (a), is broad enough, if interpreted literally and in the abstract, to cover the seller-assisted loan transactions under scrutiny here, such an interpretation would render the Rees-Levering Act virtually impotent.

Further, a reading of all of the provisions of section 2982.5 belies the interpretation sought by respondents. Subdivisions (b) and (c) of that section provide as follows: "(b) Nothing in this chapter shall be deemed to prohibit the seller's assisting the buyer in obtaining a loan upon any security from any third party to be used as a part or all of the downpayment or any other payment on a conditional sale contract or purchase order; provided that the conditional sale contract sets forth on its face the amount of the loan, the finance charge, the total thereof, the number of installments scheduled to repay the loan and the amount of each such installment, that the buyer may be required to pledge security for the loan, which security must be mutually agreed to by the buyer and the lender and notice to the buyer in at least eight-point type that he is obligated for the installment payments on both the conditional sale contract and the loan. The seller shall not provide any security or other guarantee of payment on such loan, nor shall such seller receive any commission or other remuneration for assisting the buyer to obtain such loan. If the buyer obligates himself to purchase, or receives possession of, the motor vehicle prior to securing such loan, and if the buyer upon appropriate application for such loan is unable to secure such loan, on the conditions stated in the conditional sale contract, such conditional sale contract or purchase order shall be deemed rescinded and all consideration thereupon shall be returned by the respective parties without demand."

"(c) The proceeds of any such loan payable to the seller after the date of the contract but prior to the due date of the second payment otherwise scheduled thereunder shall not be subject to a finance charge and the amount thereof shall be set forth in the contract in accordance with the provisions of subdivision (f) of Section 2982." Those subdivisions authorize, but severely restrict, the practice of sellers of arranging for financing of a pickup payment for buyers. A pickup payment, the difference between the down payment offered by the purchaser and the amount of down payment required by the seller, is ordinarily a small

---

tion is an agreement of the buyer relating to the total cost of the vehicle. This construction should be utilized only where the seller is the moving force behind the agreement." (Comment, *Recent Legislation: The Rees-Levering Motor Vehicle Sales and Finance Act* (1962) 10 UCLA L.Rev. 125, 133; fns. omitted.)

amount of money. Nonetheless, the Legislature has carefully proscribed the circumstances under which such a seller-assisted side loan may be procured and has imposed numerous disclosure requirements in connection with that loan. To accept respondents' interpretation of subdivision (a) would be to hold that the Legislature has thoroughly and carefully imposed consumer protective restrictions on small seller-assisted side note financing, but has authorized seller-assisted financing of the entire purchase price of a vehicle, less the down payment, with no restrictions whatsoever. Such an interpretation by this court would be absurd.

■ In analyzing legislation this court should first look to the plain meaning of the words used by the Legislature, but it is not bound by nor limited to such an interpretation. This is particularly true when the statute being interpreted is a part of an act.

In *Freedland* v. *Greco* (1955) 45 Cal.2d 462, 467 [289 P.2d 463], the Supreme Court evaluated recently enacted antideficiency legislation. It set out the following rules of statutory construction of such consumer protective legislation: "Taking into consideration the policies and purposes of the act, the applicable rule of statutory construction is that the purpose sought to be achieved and evils to be eliminated have an important place in ascertaining the legislative intent. [Citation.] Statutes should be interpreted to promote rather than defeat the legislative purpose and policy. [Citation.] . . . 'That construction of a statute should be avoided which affords an opportunity to evade the act, and that construction is favored which would defeat subterfuges, expediencies, or evasions employed to continue the mischief sought to be remedied by the statute, or to defeat compliance with its terms, or any attempt to accomplish by indirection what the statute forbids.' [Citations.]"

■ To conclude that the exemption in subdivision (a) is designed to exclude from the coverage of the act only independent private negotiations between a buyer and his lender, without involvement of the seller, is consistent with the legislative purpose and policy behind the act, and leaves the act free to achieve the ends and eliminate the evils to which it was originally addressed. "In determining the application of consumer protection laws to particular transactions, we have said that ' . . . we must look to the substance of the transaction and not allow mere form to dictate the result.' (*Glaire* v. *La Lanne-Paris Health Spa, Inc.,* supra, 12 Cal.3d 915, 925 [117 Cal.Rptr. 541, 528 P.2d 357]; see *Thomas* v. *Wright* (1971) 21 Cal.App.3d 921, 924-925 [98 Cal.Rptr.

874]....)" (*King* v. *Central Bank* (1977) 18 Cal.3d 840, 847 [135 Cal.Rptr. 771, 558 P.2d 857].)

The conduct of the seller and the financing agency is not exempt from the provisions of the Rees-Levering Act and appears to be a scheme of the seller designed to evade the requirements of that act. Such a scheme was anticipated when the Rees-Levering Act was enacted, and it was the opinion of at least one writer that the seller-assisted loan, possible under the former Automobile Sales Act, would not be valid under Rees-Levering.[4] California courts have often in the past considered, recognized, and declared illegal, schemes whereby automobile dealers have attempted to evade the provisions of controlling legislation. For example, in *Brewer* v. *Home Owners Auto Finance Co.* (1970) 10 Cal. App.3d 337 [89 Cal.Rptr. 231], a conditional sale contract was signed by the buyer of an automobile. On the same day, it was assigned to a lender. The agreement provided for payment of the balance in full within seven days. Two days later, the buyer and lender entered into an amendment of the agreement which provided for five-year financing. The lender took the purchased automobile as security and in addition took a deed of trust on the buyer's home. Following repossession of the car, suit was brought challenging the validity of the trust deed. The Court of Appeal cited Civil Code section 2984.2 which prohibits the

---

[4]"Methods to Avoid the Scope of the Act [¶]....[¶] *Dealer Participation Agreement.*[24a] Still another way to avoid the Act is through the use of a type of dealer participation agreement between the financing agency and the seller. For example, when the buyer negotiates with the seller and the sale is ready to be completed, the financing agency is called in to provide the buyer with a loan to pay off the purchase price, in turn taking a contract to pay off the loan in installments with a chattel mortgage on the automobile as security. Technically this is not a 'conditional sales contract' since there is obviously no *sale* of a motor vehicle by the financing agency. The security interest the finance company receives is for the loan and not the sale. [¶] [T]he transaction appears to be a device used to avoid the act and to obtain a higher rate of interest by making a direct loan. An examination of the economic incidents of these transactions suggests that allowance of the higher 'loan' rate is not justified. [Fn. omitted.] The possibility that a similar dealer participation agreement might be used in California arises because the Personal Property Brokers Law authorizes higher interest rates on loans under $500 than on sales below that amount under the Automobile Sales Act. And on loans above $5000, the maximum loan rates under the Brokers Law are not applicable [fn. omitted], thus allowing the lender to charge the maximum the market will allow."

Footnote 24a provides: "As used in this comment, the term 'dealer participation' includes any agreement between seller and financing agency by which these parties vary the normal economic consequences of the credit sale as controlled by statute." (Comment, *Project: Legislative Regulation of Retail Installment Financing* (1960) 7 UCLA L.Rev. 618, 628.)

taking of any security other than the purchased car, and held at page 342: "The concurrent assignment of the Security Agreement to appellant, the fact that it was couched in the terms of a conditional sales contract, although full payment was required at the end of seven days, the rapidity with which the 'new agreement' was executed, the 'modification' form of the new agreement, and the failure of the new agreement to refer to the trust deed, are undisputed facts which indicate infallibly that the conditional sale of the Cadillac was actually a joint undertaking between Louis Motor Sales and appellant as sellers and respondents as buyers. Such a transaction did not legally avoid the effect of Civil Code, section 2984.2, but was actually within the context of the section and at best was a subterfuge to illegally evade the section."

A similar situation was addressed in *Thomas v. Wright* (1971) 21 Cal.App.3d 921 [98 Cal.Rptr. 874]. In that case the buyer had signed a document entitled auto leasing contract. The terms and conditions of the contract, however, contained almost all of the elements and obligations of a sale. The court concluded that the contract was in fact a conditional sale contract and was therefore covered by the Rees-Levering Act, stating at page 927: "This cleverly worded document, drafted to escape the protection provided by the Automobile Sales Finance Act, enabled respondents to engage in the very evils sought to be remedied by the act."

We have no difficulty in concluding that the transactions complained of here, whereby the seller assists the buyer in obtaining financing for the purchase of one of the seller's automobiles, violates the Rees-Levering Act. The conclusion of the Interim Finance Committee, at the time it recommended passage of the Rees-Levering Act, was: "New legislation to remedy deficiencies in existing law is necessary if California is sincere in attempting to extend automobile buyers protection analogous to that provided purchasers of other types of personalty on retail installment contracts, or even the protection envisaged in the existing law regulating motor vehicle sales...."

The act was designed to protect the unsophisticated, unwary consumer. A survey conducted by the University of California at Davis, designed to measure the impact of the disclosure requirements of the Rees-Levering Act, concluded that those in the lower income bracket were the least informed about available financing options and interest rates and were the most likely to finance the purchase of an automobile through the auto dealer. (Egan et al., *The Impact of Truth in Lending*

*on Automobile Financing—An Empirical Study* (1971) 4 U.C. Davis L.Rev. 179, 194.) The most tragic consequence of the seller-assisted financing is that it removes the protection of the act from those who need it most. Respondent Espinosa testified that his business is located in East Los Angeles, that most of his customers are of limited financial means, and that those with the lowest income and fewest economic resources are the most likely to be afforded a seller-assisted personal loan, rather than a regulated loan embodied in a conditional sale contract. The conduct of defendants herein is illegal, in violation of the terms and provisions of Civil Code section 2981 et seq., the Automobile Sales Finance Act.

### Appellant's Right to Injunction

Plaintiff herein sought an injunction against defendants on the ground that their conduct constituted unfair competition within the meaning of section 17200 et seq., of the Business and Professions Code. ■ We note at the outset that the unfair competition law is not limited to acts which harm business competitors. Section 17200 defines unfair competition as follows: "As used in this chapter, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising. . . ." The California Supreme Court has often reiterated the scope of the section. In *Barquis v. Merchants Collection Assn., supra,* 7 Cal.3d at page 110, the Supreme Court said of the predecessor section (3369 of the Civ. Code), that its "broad proscription of 'unlawful [or] unfair . . . business practice[s]' illustrates no less a concern for wronged consumers." In *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, at page 808 [94 Cal. Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513], the court observed: "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society."

The unfair competition law specifically authorizes the issuance of an injunction against persons violating its provisions. At section 17203, it provides: "Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter. . . ."

The fact that the Rees-Levering Act does not expressly prohibit, in so many words, the use of a seller-assisted personal loan for the full purchase price of the car, does not restrict the court's power to enjoin that conduct. In *American Philatelic Soc.* v. *Claibourne* (1935) 3 Cal.2d 689, 698 [46 P.2d 135], the court stated: "...'The fact that the question comes to us in an entirely new guise and that the schemer has concocted a kind of deception heretofore unheard of in legal jurisprudence, is no reason why equity is either unable or unwilling to deal with him. It has been said by some judge or law-writer that, "no fixed rules can be established upon which to deal with fraud, for, were courts of equity to once declare rules prescribing the limitation of their power in dealing with it, the jurisdiction would be perpetually cramped and eluded by new schemes which the fertility of man's invention would contrive".' When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one."

The conduct of defendants herein constitutes "unlawful, unfair," and "fraudulent business practice" and is enjoinable. The trial court erred in finding that there was no common scheme or design to deprive consumers of the rights secured to them and to the general public by the provisions of the Rees-Levering Act. An injunction should have issued.

Appellant contends that the court erred in refusing to make certain findings requested by her. Because we have concluded that the evidence clearly establishes a violation of the Rees-Levering Act and the right to injunction, we need not reach the issue of the propriety of the court's findings, and we do not do so.

The judgment is reversed.

Files, P. J., and Wong, J.,* concurred.

A petition for a rehearing was denied May 13, 1980, and the opinion was modified to read as printed above. Respondents' petition for a hearing by the Supreme Court was denied July 2, 1980.

---

*Assigned by the Chairperson of the Judicial Council.