[Civ. No. 18380. Fourth Dist., Div. One. June 16, 1981.]

THE PEOPLE, Plaintiff and Appellant, v.
NATIONAL ASSOCIATION OF REALTORS et al., Defendants and
Appellants.

464

**COUNSEL**

George Deukmejian, Attorney General, Michael I. Spiegel, William S. Clark, Deputy Attorneys General, Edwin L. Miller, Jr., District Attor-

ney, Charles R. Hayes and Robert C. Fellmeth, Deputy District Attorneys, for Plaintiff and Appellant.

Harry M. Snyder, Luana L. Martilla and Carl K. Oshiro as Amici Curiae on behalf of Plaintiff and Appellant.

Lasky, Haas, Cohler & Munter, Moses Lasky, John E. Munter, William D. North, Luce, Forward, Hamilton & Scripps, Robert G. Steiner, Lee R. Rydalch and Philip D. Kopp for Defendants and Appellants.

## OPINION

**WORK, J.**—Reviewing a civil antitrust action against professional real estate organizations, we hold certain group conduct constituted both an unlawful restraint of trade permitting injunctive relief, and unlawful business activity allowing imposition of civil penalties. The additional issue of whether the associational policy of refusing to sell investment multiple listing service information to otherwise qualified persons unless they also purchase general memberships in the associations is an illegal tying arrangement was not decided below and should be remanded for further findings.

### BACKGROUND

For 20 years San Diego Board of Realtors (SDBR) with the approval of the California Association of Realtors (CAR) and the National Association of Realtors (NAR) (collectively: the associations) openly encouraged its members to maintain uniform commission rates on residential sales (generally 6 percent) and a standard percentage at which to split sales commissions between listing and selling brokers (generally 50/50) within the greater San Diego market. The rates were originally set by an express agreement among members of the SDBR, the La Mesa Board of Realtors and the El Cajon Board of Realtors (all presently combined in a multiple listing service.) SDBR publicized the uniform rate to its membership, consisting of competing real estate brokers and salespersons.

After similar actions were held to violate federal antitrust laws (Sherman Act), the associations each adopted an official "hands off" policy

regarding the fixing of commission rates by their members. NAR formally adopted such a policy in November 1971 and SDBR soon followed suit.

Detecting no appreciable change in the uniformity of commissions charged among competitors holding SDBR memberships over the next four years, the Attorney General and San Diego County District Attorney suspected anticompetitive artificial forces were preventing erosion of the uniform rate. Believing multiple policies of the associations were potentially chilling to those desiring to deviate from the standard rates, and with evidence of numerous harassing incidents by individual SDBR members directed at the only major commission price undercutter holding SDBR membership, they jointly filed this antitrust action asking for injunctive relief under the California equivalent to the Sherman Act (Cartwright Act, Bus. & Prof. Code, § 16700 et seq.)[1] and for civil penalties under the unfair competition statutes (formerly Civ. Code, § 3369, now § 17200 et seq.).

The original three-count complaint alleged: (1) unlawful restrictions of trade under the Cartwright Act through certain restrictive regulations of the multiple listing service (MLS) operated by SDBR, including the fact only board members were entitled to access to that necessary service; (2) restraint of trade because of commission rate price fixing; and (3) a charge the Cartwright Act violations were also acts of unfair competition, prohibited by Civil Code section 3369, and subject to civil penalties. The court struck the third cause of action because it believed the Cartwright Act exclusively regulated activities constituting restraints of trade.

The case was tried on an amended complaint containing six causes of action: Count one, alleging unlawful exclusion of non-SDBR members from the residential and investment MLS was both a group boycott and an illegal tying arrangement; count two, alleging antitrust violations through activities maintaining the uniform commission rate. Counts three, four and five charged the associations with individually committing unfair business practices in the setting of dues structure prohibited by section 3369, Civil Code, however, these are not pursued on appeal. The sixth count charges SDBR with individually committing the acts complained of in count two (price fixing), referring to these as unfair business practices and for violating the unfair competition sections.

---

[1]All references are to the Business and Professions Code unless otherwise specified.

(Counts three through six were alternative pleadings in response to the court's earlier ruling on exclusivity.)

On the first cause of action the court found a group boycott and issued an injunction guaranteeing access, on conditions, to the *residential* portion of the MLS to all licensed brokers and their salespersons without regard to SDBR membership. The court found no such boycott as to the MLS *investment* property portion. All other MLS operating rules were found to be reasonable, including a requirement excluding all listings except exclusive-right-to-sell agreements.

Because the court found a boycott violation relating to the restrictions on access to the residential portion of the MLS, it did not rule on the People's alternative illegal tying theory. Although the court found SDBR, CAR and NAR policies jointly created the residential MLS unlawful group boycott it enjoined only SDBR on the oral assurance CAR and NAR would comply with its holding.

SDBR obtained judgment on all other counts. Even though it found the restriction on access to the MLS investment portion did not constitute a group boycott, the court did not make findings or rule on the alternative illegal tie issue.

All parties appeal.

## RESTRICTING ACCESS TO THE RESIDENTIAL MLS ONLY TO MEMBERS OF THE SDBR CONSTITUTES A GROUP BOYCOTT.

The court's conclusion is foreordained by *Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920 [130 Cal.Rptr. 1, 549 P.2d 833].

In *Palsson* the court struck down two separate policies of the Marin County Board of Realtors as group boycotts. In restricting MLS access to the board's own members Marin substantially stifled competition in the real estate market. Similar findings and conclusions of the trial court here are overwhelmingly supported by statistical exhibits and testimony.

However, the associations contend *Palsson's* holding was not based solely on the membership restriction of the MLS above, but on that

factor *plus* the fact Marin limited board membership to persons "primarily engaged" in the real estate business. Palsson, a part-time salesperson, could not subscribe to the MLS though he were willing to join the association in order to do so. By contrast SDBR points to its nonrestrictive membership access.

The associations have lately provided us with a copy of the recent decision of the Iowa Supreme Court in *State* v. *Cedar Rapids Bd. of Realtors* (Iowa 1981) 300 N.W.2d 127, interpreting *Palsson* as holding "the *combination of two Board bylaws* unreasonably denied nonmembers access to the Board's MLS." (*Id.*, at p. 130; italics added.) We find this interpretation unpersuasive. The same argument was presented to the trial court which thoughtfully considered and correctly rejected it. (See also *Glendale Bd. of Realtors* v. *Hounsell* (1977) 72 Cal.App.3d 210, 212 [139 Cal.Rptr. 830].) The court in *Palsson* first considered whether the appeal was moot because the "primarily engaged" bylaw was deleted before the hearing on appeal. The court noted even if this were so the appeal also separately attacked another board policy limiting MLS access to members. This rule prevented MLS access to every nonmember, even one primarily engaged in the real estate trade and eligible for membership. The court analyzed each restriction separately, found each to have anticompetitive effects far outweighing any possible business justification (the rule of reason test) and separately disapproved the MLS limitation for access to board members only. (*Marin County Bd. of Realtors* v. *Palsson, supra*, 16 Cal.3d 920, 938.)

## ■ THE COURT DID NOT ERR IN "SPLITTING OFF" THE INVESTMENT LISTINGS[2] FROM RESIDENTIAL LISTINGS EVEN THOUGH BOTH WERE PRODUCTS OF A SINGLE MLS OPERATION.

The court's judgment effectively restructures the board's MLS into two parts, one for residential and one for investment properties, with nonmembers now allowed access to only the residential portion. Practically speaking, the court's slicing off the investment portion is not so

---

[2]The investment MLS is a combined venture of SDBR and the 10 other CAR/NAR affiliated Realtor Boards in San Diego County; is the only substantial investment MLS, and contains approximately 90 percent of all listed investment properties within the County of San Diego.

traumatic as to disrupt the MLS since it now publishes the investment property book separately from the residential. Although the case was tried and defended solely on the theory SDBR operated a single MLS and the evidence was presented with the People's expectation a finding of any group boycott would open the entire MLS as it existed at time of trial, we are cited to no authority limiting the power of the court to issue its injunction only against the residential MLS where, as here, that portion may be easily and completely bifurcated from the investment portion.

At the close of its case the People were put on notice the court was considering splitting its ruling on the group boycott theory between the investment and the residential portions of the MLS, and was concerned with the lack of evidence showing access to the investment portion is an economic necessity for brokers seeking to deal in investment properties in San Diego County. In spite of this warning the People made no request to reopen the evidence on this issue although previously advised the court would permit augmentation of proof in any area as to which the court felt it lacking.

The record substantially supports the court's finding the evidence fails to show lack of access to the investment portion "seriously hampers the competitive effectiveness of nonmember licensed brokers and salesmen." (See *Marin County Bd. of Realtors, Inc.* v. *Palsson, supra*, 16 Cal.3d 920, 936.)

## Is the Investment MLS Illegally Tied to SDBR Membership?

The court made no findings and did not rule on the People's alternative argument that refusing to "sell" an investment MLS membership unless the buyer also purchased SDBR membership is a prohibited tie-in arrangement.[3]

---

[3]Section 16727 is the state equivalent of section 3, Clayton Act. Sections 16720-16726 are patterned after the Sherman Act (15 U.S.C. § 1 et seq.), and each act has its roots in the common law. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953].) Decisions under the federal act are applicable when interpreting these sections. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481]; *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra*, at p. 852, 853.)

After finding a group boycott in the residential MLS the court found no necessity to determine if relief was also proper under the additional theory of illegal tying. However, by splitting off the investment MLS and finding no evidence of a group boycott to that service, the court was required to review the evidence and rule on the tying issue on which evidence had been presented.

Although the facts upon which resolution of this issue rests are not in conflict we recognize it is the function of the trial court to be the primary finder of fact, and this reviewing court is not to make findings "in the first instance." (*Larson* v. *Thoresen* (1951) 36 Cal.2d 666, 670 [226 P.2d 571].) However, for the guidance of the trial court, we discuss some relevant points raised on this appeal.

■ The purpose of the prohibition against the use of ties is to prevent a seller from using a dominant desired product to compel the purchase of a second distinct commodity. (*Moore* v. *Jas. H. Matthews & Co.* (9th Cir. 1977) 550 F.2d 1207, 1214.)

Where by conditioning a sale of one item to the sale of another a seller has the economic power to coerce buyers to forego exercise of their independent judgment as to the merits of the tied product, thus shielding it from competitive market forces, there is a restraint on competition. In fact, "[t]ying agreements serve hardly any purpose beyond the suppression of competition." (*Standard Oil Co.* v. *United States* (1949) 337 U.S. 293, 305-306 [93 L.Ed. 1371, 1382, 69 S.Ct. 1051].) The greater the market control over the tying product (here the investment MLS) the greater the economic power to restrain competition in sales of the tied product (here real estate professional association memberships).

### Separability of Products

■ At the outset SDBR contends coupling board membership and MLS access is not illegal because there are not two separate products —reasoning an organization is not severable from the services it renders, membership and the rights of membership being synonymous.

"Although we have not found, nor has our attention been directed to, any definitive test for the determination of this question, the following factors should be taken into account: (1) Whether competitors offer to sell the products or services separately or only as a unit. (2) Whether

the combined product or service is composed of varying assortments of component parts. (3) Whether buyers are, or can be, charged separately for the alleged separate products or services. [And] (4) Whether the defendant ever sells or offers to sell the products or services separately." (*Corwin* v. *Los Angeles Newspaper Services Bureau, Inc., supra*, 4 Cal.3d 842, 858-859; *United States* v. *Jerrold Electronics Corporation* (E.D.Pa. 1960) 187 F.Supp. 545, 559; affirmed *per curiam sub nom. Jerrold Electronics Corp.* v. *United States*, 365 U.S. 567 [5 L.Ed.2d 806, 81 S.Ct. 755]; *Associated Press* v. *Taft-Ingalls Corp.* (6th Cir. 1965) 340 F.2d 753, 764.) Considering the foregoing, it is apparent SDBR membership and access to its investment MLS are independent product/services, (accord *Bogus* v. *American Speech & Hearing Ass'n* (3d Cir. 1978) 582 F.2d 277) and not merely separable portions of a single unit as in the "right shoe, left shoe" hypothetical posed in *Moore* v. *Jas. H. Matthews & Co., supra*, 550 F.2d 1207, 1214.

The Supreme Court in *Marin County Bd. of Realtors, Inc.* v. *Palsson, supra*, 16 Cal.3d 920, has ruled when a multiple listing service corresponds directly with and touches upon the business activities of its members, and the association has the power to shape and influence the economic environment of its particular market the association's MLS must be made available to nonboard members, although such persons may be charged a reasonable fee for its use. (*Id.*, at p. 937.) While *Marin County* did not turn upon the question of unlawful tie-ins, its finding necessarily determines sale of board memberships are separate from sale of MLS books. Similar factors are present here: Nonmember real estate brokers can be charged separately for the SDBR investment MLS, SDBR offers the MLS separately to its own members, and the investment MLS is not a component part of board membership. The trial court's actual severance of the *residential* MLS factually confirms the severability of the SDBR *investment* MLS.

*Sufficient Economic Power*

This requires a showing SDBR possessed sufficient economic power over the investment MLS to restrain free competition in the market for the tied product (membership in other local, state or national realty associations).

The allegations in count one encompass tying arrangements made illegal under both section 16727 (the state equivalent of the federal Clayton Act, § 3) as well as sections 16720 and 16726 (patterned after

the Sherman Act). ■ Section 16727 violations may be established by a lesser evidentiary showing than required to establish an illegal tie under sections 16720 and 16726. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra*, 4 Cal.3d 842, 852.) Under section 16727 (and the Clayton Act), a tie-in is illegal if the seller (1) enjoys a monopolistic position in the market for the "tying" product *or* (2) if a substantial volume of commerce in the tied product is restrained. (See *Times-Picayune* v. *United States* (1953) 345 U.S. 594, 608-609 [97 L.Ed. 1277, 1290, 73 S.Ct. 872]; and discussion in *Suburban Mobile Homes, Inc.* v. *AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 549 [161 Cal.Rptr. 811]), while sections 16720 and 16726 (and Sherman Act) tyings are not illegal unless both conditions exist.

A tying arrangement is unreasonable per se under the Clayton Act (§ 16727) when either of the above two elements are present (*Detroit City Dairy, Inc.* v. *Kowalski Sausage Co., Inc.* (E.D. Mich. 1975) 393 F.Supp. 453, 467), although under the Sherman Act both elements are required for a finding of illegality.

Proof of requisite economic power is usually inferred from other, more easily proven, facts. Domination of the market in the tying product is sufficient to infer competition in the tied product has been or probably will be lessened by the agreement. (*United Shoe Machinery Corp.* v. *United States* (1922) 258 U.S. 451 [66 L.Ed. 708, 42 S.Ct. 363]; *International Business Machines Corp.* v. *United States* (1936) 298 U.S. 131 [80 L.Ed. 1085, 56 S.Ct. 701]; *Fashion Guild* v. *Trade Comm'n* (1941) 312 U.S. 457 [85 L.Ed. 949, 61 S.Ct. 703]; *Standard Fashion Co.* v. *Magrane-Houston Co.* (1922) 258 U.S. 346 [66 L.Ed. 653, 42 S.Ct. 360]; *Detroit City Dairy, Inc.* v. *Kowalski Sausage Co., Inc., supra*, 393 F.Supp. 453.) Thus, evidence of market dominance is sufficient to support a finding of the requisite economic power.

The "monopolistic" condition is satisfied when the seller has a "dominant" (as opposed to absolute) monopoly position in the tying product market. (*International Salt Co.* v. *U. S.* (1947) 332 U.S. 392 [92 L.Ed. 20, 68 S.Ct. 12].) Uncontradicted evidence shows SDBR dominates the local investment MLS market with the participation of 10 other CAR/NAR members, it has the only investment MLS service in San Diego County and generates at least 1,900 book sales per month.

On remand the trial court must determine if the evidence shows SDBR enjoys sufficient economic power in the tying product (investment MLS) to appreciably restrain competition in the tied product (real estate association memberships). (*Suburban Mobile Homes, Inc.* v. *AMFAC Communities, Inc., supra,* 101 Cal.App.3d 532, 549.)

### ■ THE UNFAIR COMPETITION STATUTES[4] AND THE CARTWRIGHT ACT PROVIDE CUMULATIVE REMEDIES FOR ACTS RESTRAINING TRADE.

The court recognized restraints of trade under the Cartwright Act are also unlawful business practices and therefore unfair competition as defined by statute. In spite of this, the court felt Cartwright Act violations were not intended to be included within the unfair competition statutes because it "[made] little practical sense" where the Cartwright Act provides for civil damages of a punitive nature, as well as penal sanctions, particularly when specific reference to Business and Professions Code section 17500 to 17535 is contained in section 3369. The court reasoned, if the Legislature intended to increase penalties for restraints of trade the logical method would be to amend the Cartwright Act itself. It held, the statutory reference to "unlawful, unfair or fraudulent business practice[s]" contained within former Civil Code section 3369 was intended to be limited by the later reference to "act[s] denounced by Business and Professions Code section 17500 to 17535,

---

[4]At the time this action was commenced and at the time of trial the allegations of unfair competition were governed by Civil Code section 3369, subdivision 3, which provided: "As used in this section, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, untrue or misleading advertising *and any act denounced by Business and Professions Code Sections 17500 to 17535, inclusive.*" (Italics added.) In 1977 section 3369 was amended and subdivision 3 was transferred to Business and Professions Code section 17200. (Stats. 1977, ch. 299, § 2, pp. 1203-1204.) The amended portion underlined above now reads: ". . . and any act prohibited by Chapter 1 (commencing with section 17500) of Part 3 of Division 7 of the Business and Professions Code." Unless otherwise indicated, statutory references which follow are to the current code section.

Section 17206 prescribes civil penalties for acts which constitute "unfair competition" as defined in section 17200. At the time this suit was commenced these prescriptions were contained in Civil Code section 3370.1—which was repealed in 1977—and replaced by Business and Professions Code section 17206 providing for the same civil penalty. The section reads in pertinent part: "(a) Any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California . . . ." Unless otherwise indicated, statutory references which follow are to the current code section.

inclusive;" thereby foreclosing its application to other portions of the Business and Professions Code.

. The Supreme Court has consistently held unlawful business practices included within section 17200 include ""'"anything that can properly be called a business practice and that at the same time is forbidden by law."'" (*People* v. *McKale* (1979) 25 Cal.3d 626, 632 [159 Cal.Rptr. 811, 602 P.2d 731] (interpreting former Civ. Code, § 3369 and including within its ambit violations of the Mobilehome Parks Act, formerly Civ. Code, § 789.4 et seq.), quoting *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817].) In *People* v. *K. Sakai Co.* (1976) 56 Cal.App.3d 531 [128 Cal.Rptr. 536], the court enjoined the selling of whale meat and assessed a civil penalty of $2,000 pursuant to former Civil Code section 3369 for business conduct violating The Endangered Species Act (Pen. Code, §§ 653o-653r). Further, in *People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10 [141 Cal.Rptr. 20, 569 P.2d 125], the Supreme Court held violations of the Subdivided Lands Act (§ 11000 et seq.) were properly governed by the act.[5]

The court's implication the treble damage and criminal sanction provisions contained within the Cartwright Act[6] render an additional civil penalty unnecessary is also incorrect. If no victim of a Cartwright Act violation has an individual stake great enough to warrant suit, treble damages are impractical, and where monetary damages are prospective only, they are impossible.

Where a meaningful deterrent and incentive is necessary before positive antitrust policies will be implemented, civil penalties as found in section 17206, are not superfluous.[7] (See also *Motors, Inc.* v. *Times-Mirror Co.* (1980) 102 Cal.App.3d 735 [162 Cal.Rptr. 543].)

---

[5]Further evidence sections 17500-17535 were not intended to delimit the scope of unlawful business practices described in section 17200 is contained within the text of section 17535 which provides for injunctive relief significantly similar to that prescribed in sections 17203 and 17204, and section 17536 which allows for civil penalties virtually identical to those described in section 17206—thus rendering the provisions of section 17206 apparently unnecessary to give section 17500 et seq., prohibitions effect.

[6]Sections 16750 and 16755 respectively.

[7]SDBR argues hypothetically, civil penalties based upon sections 17200 and 17206 for conduct also found violative of the Cartwright Act may amount to a "double recovery," and thus violate due process, if section 16750 relief (allowing for treble damages under the Cartwright Act) is also prayed for and awarded. (See *Hometowne Builders,*

■ When a statute is clear on its face it is both unnecessary and improper to engage in the murky interpretation process. (See *Estate of Todd* (1941) 17 Cal.2d 270 [109 P.2d 913].) It is the Legislature's responsibility to determine what is wise or practical and courts may not interpret where interpretation is not demanded (*People* v. *Sands* (1894) 102 Cal. 12, 16 [36 P. 404]); and where there is no uncertainty or ambiguity on the face of a statute the court should apply it according to its plain meaning. (*People* v. *Chambers* (1972) 7 Cal.3d 666, 674 [102 Cal.Rptr. 776, 498 P.2d 1024].)

Although the unfair competition statute uses the conjunctive term "and" to separate several classifications of prohibited conduct, there is no uncertainty (*Santos* v. *Dondero* (1936) 11 Cal.App.2d 720 [54 P.2d 764]), nor does the fact certain acts may be covered by more than one classification create an ambiguity justifying applying the clearly *broad* statutory reference "unlawful business practice," only to the *narrower* acts "denounced by Business and Professions Code Sections 17500 to 17535 . . . ."

In order for the Cartwright Act to be excluded from the section 17200 definition, therefore, the exclusion must come from the act itself. The act does just the opposite: "The provisions of this chapter are cumulative of each other and of any other provision of law relating to the same subject in effect May 22, 1907." (§ 16700; added Stats. 1941, ch. 526, § 1, p. 1834.)

NAR argues this language makes Cartwright Act penalties cumulative only of each other and of other provisions of the law relating to the same subject in effect *before* May 22, 1907. Such a restrictive interpretation undercuts the very purposes for which the Cartwright Act was enacted: "to maintain competition completely free, unlimited, and unfettered . . . [making] unlawful partial restrictions and limitations on competition as well as those which result in its complete absence." (*Associated Plumbing Contractors of Marin, etc., Counties, Inc.* v. *F. W.*

---

*Inc.* v. *Atlantic Nat. Bank* (E.D.Va. 1979) 477 F.Supp. 717.) We decline to directly address this issue because the only damages prayed for here are pursuant to section 17206. We note, however, the potential of which SDBR is concerned may be overcome through the use of offset or limiting the complaint when the problem arises. (See also *People* v. *E. W. A. P., Inc.* (1980) 106 Cal.App.3d 315, 321 [165 Cal.Rptr. 73]—dismissing the argument that assessment of civil damages provided in section 17206 would amount to a penal sanction, violative of due process, if imposed without the full panoply of rights available in a criminal trial.)

*Spencer & Son, Inc.* (1963) 213 Cal.App.2d 1, 7 [28 Cal.Rptr. 425].) By enacting section 16700 the Legislature simply "disclosed an intent that the common law is not to be superseded ...." (*Widdows* v. *Koch* (1968) 263 Cal.App.2d 228, 235 [69 Cal.Rptr. 464].) It did not evidence a desire to limit the state's ability to control unlawful and unfair business practices, nor has it adopted a policy preventing the People from remedying practices constituting "unfair competition."

■ A court must "construe every statute with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814 [114 Cal.Rptr. 577, 523 P.2d 617].) This issue was similarly resolved in the United States Supreme Court's analysis of the relationship of the Sherman Act to the federal equivalent of our unfair competition statutes (15 U.S.C.A. § 45; Fed. Trade Com. Act § 5) which also allows civil penalties. In *Trade Comm'n* v. *Cement Institute* (1948) 333 U.S. 683 [92 L.Ed. 1010, 68 S.Ct. 793], the government was admittedly proceeding under the unfair competition legislation and, at the same time, was proceeding against the same defendants in a separate Sherman Act criminal action. Assuming the same acts formed the basis for both legal actions the court, after finding no contrary congressional intent, held the two statutes provided the government cumulative remedies. (*Id.*, pp. 694, 695 [92 L.Ed., pp. 1030, 1031].)

■ Section 16700 does not exclude the civil penalty in section 17206. The demurrer was improperly sustained.

■ THE COURT DID NOT ERR IN FAILING TO ENJOIN CAR AND NAR IN A MANNER SIMILAR TO SDBR ALTHOUGH IT FOUND EACH "FOSTERED AND SANCTIONED" POLICIES ESTABLISHING AN ILLEGAL GROUP BOYCOTT.

The court has the power to refuse to enjoin future conduct where it is satisfied there is no reasonable possibility past unlawful acts will be repeated. In fact, where the injunction is sought solely to prevent recurrence of proscribed conduct which has, in good faith been discontinued, there is no equitable reason for an injunction. (*Rosicrucian Fellowship* v. *Rosicrucian etc. Ch.* (1952) 39 Cal.2d 121, 144 [245 P.2d 481]; *Mallon* v. *City of Long Beach* (1958) 164 Cal.App.2d 178, 190 [330 P.2d 423].)

In its judgment the trial court noted it received "assurances" NAR and CAR would take no action, direct or indirect, to undermine SDBR's compliance with the terms of the injunction imposed upon it. It then reserved jurisdiction for an indefinite time to impose an injunction on a showing of appropriate *future* circumstances.

We find no abuse of discretion in the court's action because it made a formal finding CAR and NAR at all times acted in conformance with their understanding of the law and with the intent to comply with that law. Further, each assured the court it had already announced to its members the similar rule established in *Hounsell* before entry of judgment herein.

While the People argue the importance of having an injunction of statewide applicability they ignore the fact the only conduct found to violate the Cartwright Act was that specifically related to the residential MLS of SDBR. As to this issue the relief prayed for was limited to the specific local MLS and board; the prayers which would have statewide application were on issues as to which they did not prevail.

## ▉ Refusing MLS Access to Any Listing Agreement Except One Which Grants the Listing Broker an "Exclusive" Right to Sell, Unlawfully Restrains Trade.

There are three types of listings common in the real estate industry:

(a) An *exclusive right to sell* listing entitles the listing broker to the agreed commission if the property sells within the time frame of the agreement even though the sale is made by persons other than the listing broker. Thus, a full commission is received if the home owner sells the property, though the broker has made no effort, nor incurred any expense toward marketing the product.

(b) An *exclusive agency* listing guarantees a commission to the listing broker in every sale except where the homeowner individually finds a buyer and makes the sale.

(c) *Open* listings are those which guarantee the listing broker a sales commission only if the property is sold through his efforts. The parties are free to negotiate what amount, if any, of the listing broker's actual

costs in attempting to market the property should be paid by the homeowner where the property is sold by another, or not sold at all.

While each listing type is potentially available to property owners in San Diego County, an owner who wishes the exposure offered by the SDBR MLS must agree to an exclusive-right-to-sell listing. This official SDBR policy is admittedly advocated and encouraged by CAR and NAR, satisfying the requirement of joint action. The People correctly argue the economic power on the market of (at least) the residential MLS combined with the listing limitation effectively throttles consumer efforts to negotiate for better deals on commissions because by so doing they will be foreclosed from essential MLS exposure. From the trial court's finding participation in the residential MLS essential to the economic success of most residential brokers operating within SDBR territory, we can deduce the unwillingness of most brokers to list residential properties (with generally smaller potential commissions than investment properties) on terms excluding them from that essential marketing tool.

The court upheld this restriction as reasonable in order to insure a listing broker advertising in the MLS will not be faced with the "higher risk of being deprived of any commission." Commendable as this personal economic concern may be in regard to brokers it overlooks the impact on the consumer (property owner).

The general public is the beneficiary of the antitrust laws and policies adopted for purposes benefitting cooperating market competitors may yet be unlawful where joint activity conflicts with the public interest in preserving competition. (*Paramount Famous Lasky Corp.* v. *United States* (1930) 282 U.S. 30 [75 L.Ed. 145, 51 S.Ct. 42].)

It is not necessary to show suppression of all competition, nor universal dissatisfaction with the policy. Neither good intentions of the parties nor some good results may offset the public right to be free from competitive restraint.

Here the proved fact of substantial MLS impact on the market place leads to the inescapable conclusion limiting access impermissibly restrains the public's ability to compete in negotiating for alternative type listings. It is this forcing of preference upon consumers which is unlawful. (*Marin County Bd. of Realtors, Inc.* v. *Palsson, supra*, 16 Cal.3d 920, 935.)

Permitting brokers to market properties listed other than by "exclusive-right-to-sell" agreements *if they desire* imposes no great foreseeable burden on the MLS. A fee sufficient to allow MLS a fair return is charged each participant in its service. Each additional property exposed through MLS potentially benefits all subscribers who may wish to pair it with a buyer. The decision to assume a "risk" of lost commission is properly a decision for the individual listing broker who may negotiate other terms which may mitigate this loss. Further, should an MLS subscriber see the listing and deal "behind the back" of the listing broker, the SDBR arbitration and grievance committees are well equipped to provide relief.

The "exclusive-right-to-sell" policy violates the Cartwright Act.

On remand the trial court shall frame an appropriate injunction as to SDBR, and such injunctions as it deems required as to CAR and NAR, to insure those using the SDBR MLS are subjected to no direct or indirect policy inducing acceptance of only exclusive-right-to-sell listings, to insure access to the residential MLS to any type listing agreement presented by its subscribers, and to insure the right of access is included in the written MLS policy.

## By Adopting and Adhering to Policies Which Encouraged Members to Discriminate in Commission Splitting Directed at Undercutters SDBR Engaged in Illegal Price Fixing.

Undisputed evidence shows San Diego area realtor associations adopted and adhered to a standard 5 percent commission rate until 1955 when it was raised to 6 percent by agreement reached during joint meetings of the major local associations. Advisory schedules were published, disseminated, and members were urged to comply. In 1974 and 1975, 97 percent of SDBR MLS properties listed were still at a flat 6 percent. (The largest portion of rates other than 6 percent were actually higher; of those 1 to 2 percent which were lower, most were attributable to Twin Palms Realty (TP), the major price undercutter whose travails are discussed below.)

The evidence shows local real estate brokers deal with nonhomogeneous products involving differentiated services and, in a truly competitive market, one would expect a wide variety of rates and prices. In the absence of either a perfectly competitive industry or governmental

price control, the degree of uniformity in rates shown here gives rise to an inference the rates are artificially and collusively stabilized.

The People introduced expert testimony of Dr. Bruce Owen, Ph.D., relating to this issue. He considered several factors:

(1) The local real estate market is "monopolistically competitive" in that there is a large number of similar sellers competing to sell different products.

(2) The MLS requirement each listing published must show the listing broker's commission rate acts as an instant "price cheater" detection device.

(3) The SDBR grievance and arbitration mechanism provides a means of keeping undercutters in line.

(4) There is an excess capacity of sellers.

(5) Failure of the uniform rate to decrease as the real estate inflation outstripped the rise in the cost of doing business.

Based in part on Owen's testimony, the trial court found the standard rates prevailing over a long period of time to be evidence of collusive price setting or other artificial influence. It also found four activities attributable to SDBR policies which are useful to maintain such uniformity: publishing and distributing sample literature using 6 percent and 50/50 split as examples; requiring the listing commission to be included in the published MLS, thus aiding those who would bring pressure to bear on price cutters; entertaining complaints against undercutters through its ethics or arbitration machinery brought by persons motivated by the undercutter's deviation from the usual 6 percent rate and 50/50 commission split, and continuing the foregoing practices even after it ceased publicly recommending adherence to the standard rate it had developed and maintained for many years. Each of the above findings is supported by substantial evidence.

Adoption of standard rates of real estate commissions through concerted efforts of a real estate board, similar to those actions engaged in by SDBR and other realtor boards in establishing uniform rates in San Diego County, was condemned as illegal per se price fixing violating the

Sherman Act, section 3, as early as 1950 in *United States* v. *Real Estate Boards* (1950) 339 U.S. 485 [94 L.Ed. 1007, 70 S.Ct. 711].

No party here contends the uniform prices were originally set other than by collusive actions of the local realtor boards with the blessing of the state and national associations, or that their actions in promoting adherence to that policy were other than per se violations of applicable antitrust legislation. They do contend, however, these transgressions, and therefore their liability for them, abruptly ceased when, in 1971 and early 1972, each adopted a 14-point policy stating unequivocally that commissions and splits were henceforth to be set individually by their members and each disavowed the previous policies. Thus, after more than 20 years of SDBR and association propagandizing the industry, and their members in particular, to the effect it was not only economically disadvantageous to cut prices or offer less than a 50/50 cooperative split, but a sanctionable breach of ethics as well, the stated policies changed.

Except for publicizing the new "hands off" policy, the associations took no affirmative action to promote individualization of pricing or splits among members, nor to encourage deviation from the artificially inculcated uniformity in San Diego County.

The People argue, as they did at trial, a per se standard of illegality is the appropriate test. This would preclude the defense (a) the rate selected was reasonable; and/or (b) there may be legitimate business purposes other than the stabilization of rates, and/or (c) the parties did not intend to impact prices by their conduct. (*Catalano, Inc.* v. *Target Sales, Inc.* (1980) 446 U.S. 643, 647 [64 L.Ed.2d 580, 584-585, 100 S.Ct. 1925]; *United States* v. *Trenton Potteries* (1927) 273 U.S. 392, 397-398 [71 L.Ed. 700, 705, 47 S.Ct. 377, 50 A.L.R. 989].)

The trial court analyzed the anticompetitive effects of this continuing conduct with little or no regard for the impact previous associational conduct had on the setting of commissions and splits. (After all, when a formation has been artificially stimulated to march to a 6 percent tune for more than 20 years its cadence is not likely to change merely because the band stops playing.)

An agreement to exchange price information *even in the absence of an agreement to adhere to a price schedule*, which tends to stabilize prices may violate antitrust laws. (*United States* v. *Container Corp.*

(1969) 393 U.S. 333, 334, 337 [21 L.Ed.2d 526, 528, 530, 89 S.Ct. 510].) However, *Container* stopped short of declaring a mere reciprocal exchange of price information, in and of itself, is a per se violation. (See conc. opn. by Fortas, J., pp. 338-340 [21 L.Ed.2d, pp. 530-531].)

We conclude the court properly refused to apply a per se rule here. In not applying a per se rule to actions only ancillarily affecting price competition the Supreme Court has adopted a policy of upholding those actions which are designed to and actually do improve competition to a degree which significantly offsets any minimal subsidiary restraint. (Generally see Sullivan, Antitrust (1977) § 76, p. 205.)

Therefore, our analysis of the trial court's findings requires a review to see if there is evidence supporting a finding the exchange of price information here was designed to and actually does promote competition and, if so, whether the stimulus to competition outweighs the anticompetitive scope of the restraints which are created.

We agree with the trial court's conclusion evidence of the long term standing prevalence of the 6 percent uniform rate evidences the impact of artificial forces on the market. There is *no* evidence to support its conclusion the SDBR has not been shown to be responsible for this artificial stabilization. In fact, the evidence viewed in a light most favorable to SDBR shows the only artificial forces on the market were those applied by or as a result of SDBR policies.

A review of the uncontradicted evidence shows the following: (1) In August 1974, SDBR adopted an MLS policy to dispel confusion generated by the then prevailing practice of designating commission split offers by symbols. Concurrently, SDBR was confronted, for the first time, by a major price cutting operation conducted by one of its own members (TP). TP extensively publicized its uniform policy of listing any property for a $1,200 commission, which it *uniformly* offered to split $800 to itself and $400 to any cooperating seller.

TP generally confined its early sales activities to the Mira Mesa area but soon spread to others and opened several branch offices.

November 10, 1974, NAR adopted a policy also designed to deal with the confusion over the use of symbols, a problem of national concern: "'If the listing broker desires to offer to any MLS participant a commission split other than the split indicated on his listing as pub-

lished by the MLS, it shall be accomplished through advance notification by letter to the other broker.'"

Four days later, Art Leitch Realtors, a direct competitor of Twin Palms, owned by NAR's first vice president who was present when the November 10th policy was adopted, sent written notice to TP that future cooperation would result only in a $400 commission regardless of amount of total commission involved. A November 2 letter from Forest E. Olson, Inc., was less tactful.[8]

A courtesy copy of the Olson letter was sent to SDBR where Executive Director Kraus read it and discarded it. Kraus was more than somewhat familiar with the issue because, as a director of the NAR, he had been present and voted to adopt the NAR policy.

(2) In February 1975, even though no brokers had used the reciprocal symbols in MLS listings since August 1974, SDBR modified its previous policy statement to include the NAR language.

In February 1975, John Kirchner was an SDBR director and its MLS committee chairman and a direct TP competitor. He contacted Henry Pena, TP's owner, and confirmed Pena's intention to uniformly continue undercutting the 6 percent "standard" rate and deviating from the 50/50 commission split. He then advised Pena there would soon be some changes made. Indeed there were. A few days later Kirchner presented a motion to his fellow SDBR board members to adopt a policy advising its members it would be proper to split a listing commission with a cooperating seller differently than publicly stated in an MLS listing if the broker who was to be excluded from the blanket offer was first notified in writing.

With Kirchner voting as a director this policy was adopted and added to the NAR language.

(3) After adoption of the February 1975 MLS commission split policy, more SDBR members sent letters to TP advising they would pay

---

[8]"This is to inform you and your sales personnel that as of this date, regardless of the commission split stated by the Multiple Listing Service of the San Diego Board of Realtors, we, Forest E. Olson, Inc., will allow your company to receive $400.00 if you should sell any of our listings. [¶] *If and when your company realizes that this business is a profession with high standards to be upheld, and think that your services are worth the current commission rate, then we will be happy to cooperate on a 50/50 basis, as we do with all brokers.*" (Italics added.)

only $400 if TP cooperated in selling their properties. Many of these letters were "blanket," referring to any future sale; some were from brokers who did not even list properties within geographical areas where TP was active; some stated their policy would change when TP raised its commission rates and split 50/50; most were from active SDBR committee members.

Several persons, in doubt about how to avoid paying the MLS listed commission split to TP, contacted Kraus and other SDBR staff members. Invariably they were referred to the MLS split policy.

(4) The language of the new policy implied individual letters had to be sent to TP before the specified property was sold, identifying that parcel. However, many letters were of the "blanket" nature. When, through arbitration, TP successfully forced a listing broker to split 50/50 (as listed in the MLS) on a sale made by TP, prompt action was taken. SDBR "clarified" its existing policy stating "blanket" letters were really sufficient. More than that, the policy was made retroactive. (This time Kirchner seconded the motion which was made by another direct TP competitor). Similar letters kept coming to TP, along with others simply expressing general dissatisfaction, and harrassing, mostly anonymous phone calls. In addition, some homeowners holding current listings with TP were informed by TP competitors that other brokers would not show their property so long as it was listed with TP.

This concerted activity of SDBR members eventually pressured TP into raising its minimum commission to $1,600 and offering a 50/50 split, however, only one brokerage elevated its previous blanket offer of $400.

On overwhelming evidence the trial court found: several brokers active in SDBR activities were having difficulty competing with TP for sales in Mira Mesa, where TP's undercutting efforts to promote listings was proving singularly successful. (Notably Ideker, Kirchner, Mason, Meetze, Diechoff, Leitch and others.) It found certain of these brokers knew and *had in mind* their problems with TP when they participated in adopting the SDBR MLS policies and *they understood the manner in which the rule contained in the statement would facilitate discriminatory treatment of TP*. In addition, SDBR's executive director, Kraus, was previously in receipt of the Olson letter.

In spite of the above findings the trial court gave no weight to the adoption of the February 1975 policy because there was no evidence a "majority of the various committees and boards in question" were motivated to adopt the policy for the purpose of affecting TP, and the later retroactive "clarification" was after the present lawsuit had been filed. There is no substantial evidentiary support for the first reason and the second is irrelevant. Undisputed evidence shows the 1976 "clarification" was adopted specifically to deal with letters which had been sent to TP. SDBR was well aware many letters had been sent to TP which were "blanket" in nature, it had no reason to believe letters had been sent to any other broker. Its retroactivity was directed solely at TP.

More importantly, the trial court's search for a specific motive on the part of SDBR to put financial pressure on TP is misplaced. None need be shown in the rule of reason analysis. If such an intent were found a per se violation would exist.

What business purpose justifies the discriminatory split policies? The trial court suggested it appeared to be a proper effort to offset confusion over the use of certain symbols on listing forms indicating the listing broker would split commissions with a cooperating selling broker on the same terms as the seller would split equivalent transactions where the rates were reversed. However, the proof shows the local practice of using such designations had already ceased in response to the August 1974 policy. A survey of SDBR MLS forms during the six months immediately preceding February 1975 showed none, and the testimony showed the problem abating by the end of 1973.

SDBR members wrote these letters and unilaterally discriminated against TP actually having in mind SDBR would uphold this practice through its arbitration service, and it did. This knowledge undoubtedly encouraged the practice which was used to goad TP into raising its prices and, in effect, to punish TP for deviating from the desired standard commission rate. The extent to which a discriminating SDBR member broker could rely is evidenced by the Clairmont Realty (Nies)-Pena (TP) arbitration. In that matter TP sold one of Clairmont's listings which advertised a 50/50 split to all comers. Previously, Clairmont had sent a "blanket" letter to TP unilaterally stating it would pay TP only $400 on any sale generated by TP. Clairmont's letter stated it was being sent in accordance with the "MLS suggestion ... in [SDBR's] Realtor Report Volume 3 No. 21 ...."

A purchase contract was executed by both buyer and seller, and by agents for both Clairmont and TP on August 13, 1975. The contract included a handwritten provision the commission would be split on a 50/50 split basis, and escrow instructions prepared August 14, 1975, reflected that agreement.

However, Clairmont's manager later learned of the contracted split and reneged, finally offering a two-third/one-third split. TP did not agree and filed a complaint with SDBR which was then arbitrated. In spite of the fact a 50/50 split was included in the already executed written purchase contract, Clairmont's later unilateral oral refusal to split either in accord with the contract, or the advertised MLS, was upheld.

By upholding its split policy in this manner, SDBR refutes its contention the policy was designed only as a more definitive expression of its hands off policy. By referring members to its split policy when executive officer Kraus and staff members received specific inquiries on how to deal with the price cutter (TP), members were, in effect, told SDBR would uphold any unilateral action taken in accordance with this policy and, in fact, it did.

Further, at an SDBR conducted seminar in November or December 1976 (even after the present law suit was filed) one speaker (identified as from SDBR) commented during his presentation on how to fill out listings and, in discussing the present law suit, stated: "'How can you deal with a $1600 broker who gives you $400 and keeps $1200 for himself?'" and further: "How would you like to deal with a guy like Henry Pena every day?'"

By refusing listing symbols which clearly state the listing broker insists in reciprocal splits in every case (e.g., "R") the new SDBR split commission policy tells brokers they must advertise specific commission splits *tailored to the specific attributes of each listing*, however, in practice if they unilaterally establish blanket discriminatory reciprocal splits in individual cases, SDBR will enforce them through its grievance and arbitration procedures *even though not based on any factors suggested by its policy.*

Interpretation of SDBR policies by its executive director and committee members has fostered unilateral commission-splitting discrimination against the competing rate cutter and permitted the use of its arbi-

tration and grievance procedures to force TP to accept reduced commission splits over its objections. By so doing SDBR gives encouragement to those brokers wishing to impose economic pressure to cause their competitor to alter its commission structure. The extent to which such brokers could rely on SDBR's support is shown in the decision rendered in the Clairmont Realty—TP arbitration where TP was also assessed the costs of the proceeding.

Although the court gave no weight to the letters and discriminatory acts of brokers who unilaterally determined to treat TP differently than others who cooperated in the sale of realty, the remaining uncontradicted evidence shows the letters did not surface until some two and one half years after SDBR's "hands-off" policy was adopted. Even during this two-and-one-half-year period the uniformity of commissions continued unabated, contrary to normal competitive economic expectations, influenced only by the policies of the association and the acts of its members in conformance thereto. We view the effect of these policies in conjunction with the existing long-term history of association activity to prevent price competition in San Diego County, the consistent promotional efforts to publicize the advantages of not competing on pricing, and propagandizing the lack of ethics involved in price cutting. The evidence shows the MLS policies have, in fact, maintained pricing uniformity and substantially stabilized the commissions charged by SDBR members as revealed by the statistics produced in this case. There is no substantial evidence to the contrary. The degree of stabilization of the monopolistically competitive market here, with a surplus of competitors selling distinguishable services, is substantial. As such it is an unreasonable restraint of trade. (*United States* v. *Container Corp., supra,* 393 U.S. 333, 334, 337 [21 L.Ed.2d 526, 530].)

By such action SDBR violates both the Cartwright Act and the unlawful competition statutes for which the People are entitled to injunctive relief, and, if appropriate, civil penalties.

The judgment is reversed in the following particulars:

(1) as to the first cause of action, paragraph 4, relating to restrictions on access to the investment portion of the SDBR MLS, the judgment is remanded for further proceedings to determine the issue of whether an illegal tying arrangement exists and to grant appropriate relief if required.

(2) as to the second and sixth causes of action the judgments are reversed and the matter remanded with directions to issue injunctive relief on appropriate terms as generally contained in the prayer of the second amended complaint, paragraphs 1(a), (d), (e) and (f); 2, and 5.

On remand the court is directed to determine and impose the appropriate civil penalty, if any, for each act found to violate the Cartwright Act.

In all other respects the judgment is affirmed.

Brown (Gerald), P. J., and Staniforth, J., concurred.

Petitions for a rehearing were denied July 3, 1981, and the petition of defendants and appellants for a hearing by the Supreme Court was denied September 23, 1981.