[No. A015212. First Dist., Div. One. May 16, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
BILL TOOMEY, Defendant and Appellant.

4

## COUNSEL

Aaron L. Katz and Philip S. Rosenblatt for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Donna Petre and Edward P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NEWSOM, J.**—Appellant Bill Toomey and his wife are the sole owners of Holiday Funshine, Inc. (hereafter Holiday) established in 1975, through which he sells discount coupons for use at Reno casinos.

In the first few years of operation, appellant[1] solicited sales by advertising in newspapers and printed mailers. Later, telephone solicitations were used to sell the coupon packages. The casinos where discount coupons were to

---

[1]Appellant will be used to refer to both Toomey and Holiday, although, as we will note, they are one and the same. For purposes of this action, Toomey is the company.

be redeemed offered such benefits as inducements to attract customers, and customarily authorized distributors such as Holiday to print such coupons through third party promoters. Sometimes, Holiday sold its casino promotion packages wholesale to other distributors for resale to consumers.

The coupon packages varied slightly, but basically took two forms: those redeemable at individual casinos, which included cash, free token play at a designated slot machine, drink coupons, food credits, and gambling incentive coupons such as "Lucky Bucks," and a "Mini-Bus" package, which provided the buyer with many of the same coupons, to be used at more than one casino during a bus tour. The casino packages were priced at $25 to $30, and were generally represented by solicitations or advertisements to be worth hundreds of dollars.

A complaint was filed on November 4, 1976, by the Attorney General and the District Attorney of Santa Clara County charging Toomey (individually and doing business as Holiday Funshine, Inc.) with unfair business practices (Bus. & Prof. Code, § 17200) and misleading and untrue advertisements (Bus. & Prof. Code, § 17500).[2] A first amended complaint was subsequently filed, adding a cause of action alleging unlawful "bait and switch" business practices.

On February 2, 1978, pursuant to a motion by respondent, the trial court issued a preliminary injunction which, in summary, enjoined appellant, his agents, or anyone acting in concert with him, from making untrue or misleading representations—enumerated in the order—when offering goods or services for sale; from failing to disclose conditional restrictions or additional charges placed upon the sale of goods and services; from collecting or accepting any money for the sale of goods or services based upon misrepresentations or business practices prohibited by the injunction; from substituting goods or services for those represented without notifying buyers and offering a cash refund if the substitution is not acceptable, and, finally, from failing to keep records of customer complaints, refunds and other specific correspondence.

When the preliminary injunction was issued appellant reviewed it with his attorney, but admittedly made no significant changes in his business practices, since he felt his solicitations were not misleading.

The prosecution offered testimony from numerous witnesses who did not receive what they had been led to believe by appellant's advertisements and

---

[2]All statutory references are to the Business and Professions Code unless otherwise indicated.

solicitations. Buyers alleged, for example, that they were not informed of conditions and restrictions placed on the use of the coupons: that "free" token play coupons were generally redeemable only at machines for which, according to the testimony of Robert C. Voss, a senior agent with the Nevada State Gaming Control Board, the rate of return was so low as to make the coupons virtually valueless, and that such coupons could only be redeemed at a rate of 1 each hour for up to 14 consecutive hours, requiring the customers to stay on the premises for absurdly long periods of time.

Further testimony tended to prove that many of the coupons were only redeemable with the addition of the buyer's own money: for instance, to place a bet with "Lucky Bucks," or other betting coupons, buyers were forced to place a cash bet matching the amount of the coupon.

Customers of Holiday also testified that they had difficulty redeeming the coupons. Many were burdened with the inconvenience of waiting in long lines or going to inconvenient locations to use coupons provided. And, sometimes, the casinos at which the coupons were to be used had closed or discontinued the program, making redemption either burdensome—if a substitute coupon was provided—or impossible.

Buyers were generally not told of these restrictions when solicited to purchase the coupon packages, although the coupons themselves mentioned some conditions of use. And dissatisfied customers were often refused refunds. The evidence shows that customer's complaints and requests for refunds were regularly met with rejections or offers of substitute coupons rather than cash refunds.

After the preliminary injunction was issued, appellant actually expanded operations. Telephone solicitations were used more often. Under the name of Golden West Marketing, appellant established telephone solicitation offices in San Jose and San Leandro, staffed by employees who were paid on a commission basis, and drafted the scripts used by appellant's telephone solicitors. He neither showed his employees the preliminary injunction nor cautioned them to comply with it.

Appellant also sold more coupon packages wholesale to distributors after the preliminary injunction was issued. While these distributors operated independently from appellant, they used appellant's coupons and exchanged sales "pitches" with Toomey.

Appellant's business branched out to other forms of coupon packages after 1977. "Shopping Spree" coupon books and accompanying scripts, devised and marketed by Toomey, offered coupons for goods and services from

local merchants. These coupons sold for approximately $30, although they were touted as being worth hundreds of dollars by appellant.

The evidence shows that buyers did not always receive what was represented by solicitations or advertisements. Some of the coupons were redeemable at businesses which were not still operating. Other coupons were difficult to use, with some merchants requiring coupon-holders to submit to long waiting periods. And some coupons were for services which were free to the buyer without them.[3] None of these conditions were mentioned by the seller. Neither were buyers told that they had a three-day period in which to cancel the purchase. Again, dissatisfied customers found it difficult or impossible to get a refund from appellant despite numerous complaints.

The People also offered the testimony of witnesses who complained that appellant sent them coupon books which they had not ordered, and then billed them through their credit card account numbers—apparently known from prior purchases. In many such cases, appellant refused to grant refunds until threatened with prosecution by the district attorney's office.

While the preliminary injunction was in effect, appellant printed and sold hundreds of thousands of coupon packages. The prosecution's evidence detailed appellant's sales. For example, appellant's "C.O.D." sales of casino coupons for 1979-1980 were nearly 1,000 per month nationwide, each sold at $30 or more per unit. In 1980-1981, the evidence reveals that appellant printed and distributed 74,000 Las Vegas Fun Check coupon books, 7,000 San Jose Shopping Spree books, 5,000 Peninsula Shopping Spree books, 5,000 East Bay Shopping Spree books, 3,000 Richmond Shopping Spree books, and 2,000 Denver Shopping Spree books. Between 1978 and 1980, appellant employed at least 10 full-time telephone solicitors to sell casino coupons; they made from 8,000 to 12,000 monthly telephone solicitations and sold in excess of 8,000 casino books per month.

An inordinate number of the credit card sales during this period resulted in charge-backs: a charge-back occurs when the customers instructs the bank to reverse the charge on his or her credit account. A Wells Fargo Bank

---

[3]The testimony of Josephine Trinidad is illustrative of the misleading practices associated with the sale of "Shopping Spree" coupons. She bought such a coupon book, valued at $3,000 by the solicitor, for $29.95. She was not told of any conditions of use, nor was she informed of her right to cancel the sale within three days. She tried to use a car repair coupon for a front-end alignment, but the merchant had gone out of business. She had difficulty using the haircut coupon, and finally redeemed it at a beauty college where such services were free without the use of a coupon. Finally, a rug shampoo coupon, valued at $52, got her the services of a Kirby vacuum cleaner salesman who cleaned a three-foot by six-foot patch of her rug as part of his demonstration. Ms. Trinidad was not able to get a refund from Holiday until she complained to the Attorney General's office.

credit account in the name of Galaxy Marketing Corporation, under which appellant apparently did some of his business, incurred so many charge-backs that the bank closed the account in December of 1980. A bank employee testified that the number and proportion of charge-backs for this account was unprecedented. Apparently, appellant had another credit account with Bank of America that was closed by the bank for the same reason.

Evidence of appellant's assets and income was admitted on the issue of penalties. An investigator from the Attorney General's office reviewed appellant's bank records and offered testimony of deposits made by Toomey.

In his deposition, admitted into evidence at trial, Toomey valued his home at $270,000 and admitted ownership of additional real estate in San Jose and Fremont. He also owned a one-third interest in a Reno casino, which was sold for a profit of approximately $34,000 in 1979, but which appellant was never able to collect due to the debtor's bankruptcy. No other evidence of appellant's net worth was produced at trial. By the time of trial, Holiday was out of business.

Based upon this evidence, judgment was entered against appellant as follows: $150,000 in penalties was assessed for violation of the preliminary injunction (Bus. & Prof. Code, § 17535.5); civil penalties in the amount of $150,000 for violations of sections 17200 and 17500 were imposed; appellant was ordered to comply with Civil Code section 1689.6 by providing refunds to all customers upon timely request; and appellant was directed to make restitution to all customers who purchased goods or services from him or his distributors between February 8, 1978, and the date of judgment, and to maintain an impound account for this purpose. A permanent injunction was also issued, containing prohibitions and requirements similar to those found in the preliminary injunction, with some additional provisions.

Appellant complains that he was denied due process of law by the introduction of evidence which varied from the issues presented by the People's second amended complaint. Specifically, appellant objects to the following evidence as beyond the scope of the pleading: the testimony of four witnesses who purchased appellant's "Shopping Spree" merchant coupons, and the testimony of three witnesses who bought Reno casino coupons from distributors other than Holiday.

The People's second amended complaint contains four distinct causes of action for: 1) misrepresentations and nondisclosures in connection with the sale of Reno casino coupons (§ 17500); 2) acts of unfair competition associated with the same sales (§ 17200); 3) violation of the preliminary injunc-

tion (§ 17535.5); and 4) violation of the statutes governing home solicitations (hereafter home solicitation sales act) (Civ. Code, § 1689.5 et seq.), specifically in failing to inform consumers of the right to cancel as required by law (Civ. Code, §§ 1689.6, 1689.7). Appellant argues that evidence of purchases by consumers from other distributors and sales of "Shopping Spree" coupons constitutes a "material variance" from the pleading.

■ Well established is the rule that a party must recover on the cause of action alleged in the complaint and not on a separate and distinct cause of action disclosed by the evidence. (*Barrere* v. *Somps* (1896) 113 Cal. 97, 102 [45 P. 177]; *Weissensee* v. *Chronicle Publishing Co.* (1976) 59 Cal.App.3d 723, 729 [129 Cal.Rptr. 188].) "Findings of fact must be responsive to the pleadings. [Citations.] The admission of evidence as to matters not within the pleadings is prejudicial error." (*Mayer* v. *Beondo* (1948) 83 Cal.App.2d 665, 668 [189 P.2d 327].) "A judgment that goes beyond the issues litigated is void insofar as it exceeds those issues." (*Kraemer* v. *Superior Oil Co.* (1966) 240 Cal.App.2d 642, 647 [49 Cal.Rptr. 869].)

But only a "material variance" between the pleading and proof is fatal to the case. (*Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202, 212 [259 P.2d 656].) A material variance is one which is prejudicially misleading to the adverse party. (*Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 143-144 [181 Cal.Rptr. 732, 642 P.2d 792]; *Pulse* v. *Hill* (1963) 217 Cal.App.2d 301, 302 [31 Cal.Rptr. 765].) "A difference between the allegation and the proof which relates merely to quantity or degree rather than kind, is not a variance in contemplation of law." (*Stienback* v. *Halsey* (1953) 115 Cal.App.2d 213, 220 [251 P.2d 1008].)

Further, a variance, even if material, will be disregarded if the new matter was received and the action fully and fairly tried on the merits. (*Franz, supra,* 31 Cal.3d at p. 144; *Weissensee, supra,* 59 Cal.App.3d at p. 729; *Cooper* v. *Board of Medical Examiners* (1975) 49 Cal.App.3d 931, 942 [123 Cal.Rptr. 563].) As noted in *Davis* v. *Cordova Recreation & Park Dist.* (1972) 24 Cal.App.3d 789, 794 [101 Cal.Rptr. 358], quoting from *Duncan* v. *Sunset Agricultural Minerals* (1969) 273 Cal.App.2d 489, 494 [78 Cal.Rptr. 339]: " 'It has long been settled law that where (1) a case is tried on the merits, (2) the issues are thoroughly explored during the course of the trial and (3) the theory of the trial is well known to court and counsel, the fact that the issues were not pleaded does not preclude an adjudication of such litigated issues and a review thereof on appeal.' "

■ Here, the People's third cause of action for violation of the preliminary injunction is not limited to sales of Reno casino coupons; it charges appellant with sales of any goods or services in violation of the provisions

of the injunction. And the fourth cause of action is not restricted to sales of casino coupons, but rather simply alleges unlawful sales of $25 or more at consumers' homes. Thus, the evidence of "Shopping Spree" coupon sales is within the scope of these two causes of action, defeating any claim of variance.

Evidence of sales by third party distributors was also properly within the allegations of the third cause of action for violation of the injunction's provisions against assisting others in the sales of goods and services "by means which are not in conformity with the [requirements of the preliminary injunction]." And such evidence was relevant to the claims of unfair and misleading business practices upon a showing, as was made here, that appellant participated in the third party sales by furnishing the coupons or solicitations. (See *People* v. *Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 918-920 [132 Cal.Rptr. 767].)

In addition, the evidence to which appellant now objects was admitted without protest at trial, with all issues being fully and fairly litigated. It appears that appellant was fully aware that the prosecution intended to adduce the evidence of which he now complains. We accordingly conclude that a prejudicial material variance has not been shown. (*Franz, supra,* 31 Cal.3d 124; *Cooper, supra,* 49 Cal.App.3d 931.)

Appellant next argues that he has been denied equal protection by being improperly singled out for prosecution. He so argued in support of his motion for a new trial, noting that other distributors were selling coupon packages similar to that offered by Holiday and yet had not been subjected to prosecution.

In the landmark case of *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44], our high court announced that "an equal protection violation does not arise whenever officials 'prosecute one and not [another] for the same act' [citation]; instead, the equal protection guarantee simply prohibits prosecuting officials from purposefully and intentionally singling out individuals for disparate treatment on an invidiously discriminatory basis." (*Id.,* at p. 297.) "Prosecutorial discretion permits the choice among possible defendants which to prosecute, whether to prosecute, and in what order to prosecute." (*People* v. *Superior Court (Lyons Buick-Opel-GMC, Inc.)* (1977) 70 Cal.App.3d 341, 344 [138 Cal.Rptr. 791].) Thus, as explained in *Murgia, supra,* at page 298: "[I]n order to establish a claim of discriminatory enforcement a defendant must demonstrate that he has been deliberately singled out for prosecution on the basis of some invidious criterion." (See also *People* v. *Gregori* (1983) 144

Cal.App.3d 353, 359-360 [192 Cal.Rptr. 555]; *People* v. *Blend* (1981) 121 Cal.App.3d 215, 230 [175 Cal.Rptr. 263].)

Appellant has failed to establish intentional discriminatory prosecution. His claim of selective enforcement is supported only by reference to other persons who *may* have been selling coupons under similar unlawful circumstances.[4] The record is devoid of evidence of discriminatory purpose. Appellant's mere charge of selective enforcement is insufficient. (*People* v. *Gregori, supra,* 144 Cal.App.3d at p. 360; *Lyons* v. *Municipal Court* (1977) 75 Cal.App.3d 829, 844 [142 Cal.Rptr. 449].) Lacking the requisite prima facie showing that the prosecution was inspired by an improper discriminatory motive, appellant's equal protection claim must be rejected. (*People* v. *Blend, supra,* 121 Cal.App.3d 215, 230; *Perakis* v. *Superior Court* (1979) 99 Cal.App.3d 730, 734 [160 Cal.Rptr. 445].)

Appellant challenges the finding that Holiday's sales violated the home solicitation sales act (Civ..Code, § 1689.5 et seq.), arguing that the telephone solicitations initiated from its offices were not *home* contracts governed by the act.

Civil Code section 1689.5, subdivision (a), defines a "Home solicitation contract or offer" as "any contract, whether single or multiple, or any offer which is subject to approval, for the sale, lease or rental of goods or services or both, made at *other than appropriate tradepremises* in an amount of twenty-five dollars ($25) or more including any interest or service charges." (Italics added.) Subdivision (b) of section 1689.5 states that " 'Appropriate trade premises' means premises at which either the owner or seller normally carries on a business, or where goods are normally offered or exposed for sale in the course of a business carried on at those premises." Appellant submits that Holiday's telephone sales were initiated from its trade premises and consequently cannot be characterized as home contracts.

■ The focus of the "home solicitation" requirement centers upon the place where the contract was made. (*Williams* v. *Kapilow & Son, Inc.* (1980) 105 Cal.App.3d 156, 161 [164 Cal.Rptr. 176]; *Weatherall Aluminum Products Co.* v. *Scott* (1977) 71 Cal.App.3d 245, 248 [139 Cal.Rptr. 329].) The purpose of the legislation was to "protect consumers against the types of pressures that typically can arise when a salesman appears at a buyer's home." (*Weatherall, supra,* at p. 248.) Such pressures include "the buyer being forced to make an immediate decision regarding a product or service

---

[4]While appellant has introduced evidence that other businesses sold similar coupons, he has not shown that their solicitations and advertisements were akin to the misleading practices of Holiday.

which he had not contemplated acquiring until the seller appeared at his door" and the seller's intimidating presence once inside the buyer's home. (*Ibid.*)

According to California law, any contracts solicited over the telephone by Holiday must be deemed made at the buyers' homes—where the offers were accepted. (*Travelers Ins. Co.* v. *Workmen's Comp. App. Bd.* (1967) 68 Cal.2d 7, 14 [64 Cal.Rptr. 440, 434 P.2d 992].) We recognize that telephone solicitations do not result in an intimidating presence of the seller in the buyer's home to the extent found in a "door-to-door" sale; yet the same pressure to make an immediate decision arises from such solicitations, justifying the protection of the home solicitation sales act—particularly its three-day cancellation provision (Civ. Code, §§ 1689.6, 1689.7). For this reason we conclude that appellant's sales justly fall within the definition of "home solicitations" set forth in section 1689.5, subdivision (a).

Next, Toomey contends that the record does not establish violations of sections 17200 and 17500, and particularly by him in his individual capacity. Two separate questions are presented by his challenge to the sufficiency of the evidence. First, were Holiday and Toomey improperly found responsible for the acts of employees and independent distributors? Second, does the evidence establish misrepresentations and unfair practices by appellant?

Toomey insists that he cannot be held liable under sections 17200 and 17500 for the acts of his employees, and that neither he nor Holiday are responsible for the solicitations and sales made by independent distributors.

The concept of vicarious liability has no application to actions brought under the unfair business practices act. While Holiday can, of course, be held liable for violations of sections 17200 and 17500 by its employees (see *Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 358 [185 Cal.Rptr. 453, 650 P.2d 328]; *Chern* v. *Bank of America* (1976) 15 Cal.3d 866 [127 Cal.Rptr. 110, 544 P.2d 1310]), Toomey's individual liability must be predicated on his personal participation in the unlawful practices. In *People* v. *Regan* (1979) 95 Cal.App.3d Supp. 1 [157 Cal.Rptr. 62], the defendant, owner and manager of a business, was charged with violating section 17500 based upon conduct by his employee. The court concluded that vicarious liability could not be imposed upon defendant without a showing of his knowledge or participation in the illegal conduct. (*Id.,* at p. 4.) The court in *Regan* emphasized that a person does not become liable under section 17500 merely by virtue of his status as a business owner. (*Ibid.*) Similarly, in *People* v. *E.W.A.P., Inc.* (1980) 106 Cal.App.3d 315 [165 Cal.Rptr. 73], the defendant argued that civil penalties cannot be imposed under section 17206 absent a showing of scienter. The

court responded by explaining that the evidence established defendant's participation in the unlawful acts, thereby impliedly recognizing the need to prove active and knowing involvement in the offending conduct by the defendant. (*Id.*, at p. 322.)

But if the evidence establishes defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal, liability under sections 17200 and 17500 can be imposed. (*People* v. *Bestline Products, Inc., supra,* 61 Cal.App.3d 879, 918-919; *People* v. *Witzerman* (1972) 29 Cal.App.3d 169, 181 [105 Cal.Rptr. 284]; *People* v. *Arthur Murray, Inc.* (1965) 238 Cal.App.2d 333, 341 [47 Cal.Rptr. 700]; *International Art Co.* v. *Federal Trade Commission* (7th Cir. 1940) 109 F.2d 393, 396.) In *Bestline Products, supra,* the court explained: "All parties to a conspiracy to defraud are directly liable for all misrepresentations made pursuant to such conspiracy and anyone who knowingly aids and abets fraud or furnishes the means for its accomplishment is liable equally with those who actually make the misrepresentations." (61 Cal.App.3d at p. 918.)

And it is settled that a managing officer of a corporation with control over the operation of the business is personally responsible for acts of subordinates done in the normal course of business. (*People* v. *Conway* (1974) 42 Cal.App.3d 875, 885-886 [117 Cal.Rptr. 251]; *People* v. *International Steel Corp.* (1951) 102 Cal.App.2d Supp. 935, 942 [226 P.2d 587].) In *Conway* the court found the evidence "sufficient to show that appellant, . . . was in a position to *control* the activities of the dealership and thus could be held criminally liable for false advertising." (42 Cal.App.3d 875, 886.)

Toomey was the president and operating officer of Holiday. He orchestrated all aspects of the business. Overwhelming evidence shows that he prepared the solicitation scripts, determined the content of coupon packages to be sold, and directed the refund policy which the company followed.[5] In sum, Toomey had unbridled control over the practices which were found violative of sections 17200 and 17500. His position in the corporation and operation of the business subjects him to liability for misleading solicitations made by his employees. (*People* v. *Conway, supra,* 42 Cal.App.2d 875, 886.)

Toomey also participated in the unlawful practices of Holiday and its distributors. He shared coupons with the distributors, and according to the evidence discussed with them the content of the solicitations to be used.

---

[5]Toomey often states in his brief that he did not make any of the misleading solicitations or representations. While he is entitled to make arguments from the record, we find this close to the line of misrepresentation, rather than argument, since the evidence so clearly shows that Toomey was in essence, the company.

Holiday often received complaints from distributors and determined the responsive action to be taken. Appellant collected receipts from sales made by the distributors; and consumers' checks made out to another distributor were often endorsed by Holiday. The record depicts Toomey as the moving force behind the entire coupon sales program and a joint participant with the other distributors in their business operations. As such, he was responsible for the misleading and unfair practices of both Holiday and the distributors which sold its coupons. (*People* v. *Bestline Products, Inc., supra,* 61 Cal.App.3d 879, 919-920; *People* v. *Arthur Murray, Inc., supra,* 238 Cal.App.2d 333, 341-342.)

■ The evidence also amply supports the findings of violations of sections 17200 and 17500. Prospective buyers were not informed during the telephone solicitations of significant limitations and conditions placed upon use of the coupons: that, for example, many coupons were redeemable only hourly, and that "Lucky Bucks" could only be used in conjunction with the consumers' own money. We acknowledge that the conditions of use were stated on the coupons, but this was of little use to consumers who had already purchased the coupon package and were unable to obtain refunds. The record also reveals that some of the casino and merchant coupons were unredeemable for one reason or another, such as cancellation of the benefit or closure of the business. Again, appellant was not amenable to granting refunds even when presented with justified complaints.

■ Section 17200 prohibits "unfair competition," which is defined therein as including only "unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising. . . ." "What constitutes 'unfair competition' or 'unfair or fraudulent business practice' under any given set of circumstances is a question of fact, the essential test being whether the public is likely to be deceived." (*Payne* v. *United California Bank* (1972) 23 Cal.App.3d 850, 856 [100 Cal.Rptr. 672].)

■ Section 17500 makes it unlawful "for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to [induce] the public to enter into any obligation relating thereto, to make or disseminate . . . before the public . . . any statement . . . which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." "Under this section, a statement is false or misleading if members of the public are likely to be deceived. . . . 'The statute affords protection against the probability or likelihood as well as the actuality of deception or confusion.'" (*Chern* v. *Bank of America, supra,* 15 Cal.3d 866, 876; see also *Committee on Children's*

*Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660].)

We encounter little difficulty concluding that Holiday's telephone solicitations and newspaper advertisements were likely to deceive consumers. The failure of appellant to disclose conditions and limitations on the use of the coupons misrepresented the nature and value of the product and therefore in itself constituted "unfair competition" and "false or misleading statements" under sections 17200 and 17500. (*Chern, supra,* 15 Cal.3d at p. 876; *People* v. *James* (1981) 122 Cal.App.3d 25, 35-36 [177 Cal.Rptr. 110].)

Appellant also challenges that part of the judgment finding him in violation of the preliminary injunction and fining him $50,000 in accordance with section 17535.5.[6] Appellant characterizes the action as a contempt proceeding under Code of Civil Procedure sections 1217-1218, entitling him to the full panoply of constitutional rights afforded in such a "quasi-criminal" case. (*Safer* v. *Superior Court* (1975) 15 Cal.3d 230, 244 [124 Cal.Rptr. 174, 540 P.2d 14]; *Ransom* v. *Superior Court* (1968) 262 Cal.App.2d 271 [68 Cal.Rptr. 507].) Specifically, appellant claims that the trial should have been bifurcated, with the "contempt" proceeding tried by a jury.

Appellant mischaracterizes the nature of the proceeding. He was not charged with contempt under section 1218 of the Code of Civil Procedure. The third cause of action, upon which the judgment was predicated, alleged violations of the preliminary injunction (§ 17535) in contravention of section 17535.5. Thus the case against appellant was not criminal or quasi-criminal in nature.

■ "The constitutional safeguards applicable in the criminal area do not apply in a case presenting the possible exposure to civil penalties." (*Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 161 [181 Cal.Rptr. 784, 642 P.2d 1305].) And it is now firmly established that an action brought pursuant to the unfair business practices act seeks only civil penalties, and accordingly the due process rights which apply in criminal actions, including the right to a jury trial, need not be provided. (*People* v. *Superior Court*

---

[6]Subdivision (a) of section 17535.5 provides: "(a) Any person who intentionally violates any injunction issued pursuant to Section 17535 shall be liable for a civil penalty not to exceed six thousand dollars ($6,000) for each violation. Where the conduct constituting a violation is of a continuing nature, each day of such conduct is a separate and distinct violation. In determining the amount of the civil penalty, the court shall consider all relevant circumstances, including, but not limited to, the extent of harm caused by the conduct constituting a violation, the nature and persistence of such conduct, the length of time over which the conduct occurred, the assets, liabilities and net worth of the person, whether corporate or individual, and any corrective action taken by the defendant."

*(Kaufman)* (1974) 12 Cal.3d 421, 431 [115 Cal.Rptr. 812, 525 P.2d 716]; *People* v. *E.W.A.P., Inc., supra,* 106 Cal.App.3d 315, 321; *People* v. *Witzerman, supra,* 29 Cal.App.3d 169, 176-177.)

Section 17535.5, like the rest of the penalty provisions of the unfair practices act, imposes civil penalties. And while such sanctions may be severe, as illustrated by the case before us, they do not raise the spectre of involuntary confinement—the loss of liberty which characterizes criminal proceedings. No part of the action against appellant was criminal in nature and therefore he was not entitled to bifurcation of the proceedings or a jury trial.

 Next, repeating much of his earlier argument, Toomey maintains that he was improperly found to have violated the *preliminary injunction* in his "individual capacity." While appellant insists that he never *individually* misrepresented the features of Holiday's casino packages or otherwise violated the preliminary injunction, the evidence shows his participation in the solicitation and sales programs which resulted in such violations. As the controlling force in Holiday and Galaxy Marketing Corporation, Toomey is responsible for the deceptive solicitations made by employees of those businesses. (*People* v. *Conway, supra,* 42 Cal.App.3d 875, 886.) And as a participant in the sales programs of both Holiday and the third party distributors, Toomey incurs liability for all violations of the injunction committed in accordance with the common marketing scheme. (*People* v. *Bestline Products, Inc., supra,* 61 Cal.App.3d 879, 919-920.) Significantly, the preliminary injunction specifically enjoined appellant from assisting others in misleading or deceptive practices, thus furnishing an additional ground for finding him in violation of section 17535.5. Toomey is as much individually responsible for the violations of the preliminary injunction as he was for the statutory violations.

The evidence also supports the findings that the casino and merchant coupon solicitations violated the provisions of the preliminary injunction.

 Our review of the evidence is limited by the substantial evidence rule. (*People* v. *Witzerman, supra,* 29 Cal.App.3d 169, 181.) Viewing the record in light of the presumption that it contains evidence to support every finding of fact, we are obliged to uphold the trial court's determination if there is any substantial evidence to support the challenged finding. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162,

479 P.2d 362].) And all legitimate and reasonable inferences are indulged to support the findings of the trial court. (*Ibid.*)[7]

Appellant challenges the findings that 1) the solicitations misrepresented that buyers would not have to use their own money to redeem the coupons, 2) the coupons were not being sold at a reduced price or as an award to selected persons as represented by appellant, 3) material conditions and restrictions on the use of the coupons were not disclosed, 4) redemption locations were undisclosed or unavailable, 5) appellant collected money from purchasers who relied upon Holiday's misrepresentations to their detriment, 6) coupons were substituted without prior approval from the buyer or an offer of a refund, 7) appellant assisted distributors in violating the law, and 8) appellant did not change its improper marketing techniques following issuance of the preliminary injunction.

We find in the solicitation scripts and testimony of complaining witnesses ample evidentiary support for the trial court's findings of facts and the conclusion that appellant violated the preliminary injunction. The evidence depicts a method of operation characterized by nondisclosures, deception, failure to provide goods as promised, and refusal to grant refunds. These practices continued unabated despite the preliminary injunction which forbade them.[8] We thus conclude that appellant was properly found to have acted in contravention of the preliminary injunction. Appellant also attacks the permanent injunction, claiming that it has no basis in fact. Specifically, appellant argues that the People failed to show any threatened continued violations, as is required for imposition of a permanent injunction.

Section 17535 authorizes the trial court to enjoin any "person, corporation, [or] firm . . . which violates . . . this chapter," adding that

---

[7]Appellant views the action as penal in nature, hence requiring a greater burden of proof—something akin to beyond a reasonable doubt—and a more liberal and independent standard of appellate review. But as noted, the law views actions under the unfair business practices act as civil, making the substantial evidence standard of review applicable. (*People* v. *Superior Court (Kaufman)*, *supra*, 12 Cal.3d 421, 431-432; *People* v. *National Association of Realtors* (1981) 120 Cal.App.3d 459, 474-475, fn. 7 [174 Cal.Rptr. 728, 22 A.L.R.4th 79].)

[8]Appellant states throughout his briefs that the preliminary injunction only enjoined him from "the sale of coupons and nothing more." He then insists that he ceased the sale of casino coupons following issuance of the preliminary injunction, and turned to sales of merchant coupon packages—which often included a "free" casino coupon—which makes the injunction inapplicable to his post-1978 business practices. Respondent characterizes this argument as an intentional distortion of the record. Again, while we feel that appellant's argument may be overzealous, and is certainly without foundation, we classify it as argument rather than misrepresentation of the record. Still, we heartily disapprove of appellant's tendency to cite facts out of context in making his contentions.

the court may "make such orders . . . as may be necessary to prevent the use or employment . . . of any practices which violate this chapter. . . ." (See also § 17203.)[9] (*People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10, 17 [141 Cal.Rptr. 20, 569 P.2d 125].) Section 17535 vests the trial court with broad authority to fashion a remedy that will prevent unfair trade practices and will deter the defendant and others from engaging in such practices in the future. (*McConnell* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1983) 33 Cal.3d 816, 821 [191 Cal.Rptr. 458, 662 P.2d 916]; *Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442, 450 [153 Cal.Rptr. 28, 591 P.2d 51].)

Injunctive relief under sections 17203 and 17535 cannot be used, however, to enjoin an event which has already transpired; a showing of threatened future harm or continuing violation is required. (*Dunkerley* v. *Taylor\** (Cal.App.).) Injunctive relief has no application to wrongs which have been completed (*Gold* v. *Los Angeles Democratic League* (1975) 49 Cal.App.3d 365, 372 [122 Cal.Rptr. 732]), absent a showing that past violations will probably recur. (*Palo Alto-Menlo Park Yellow Cab Co.* v. *Santa Clara County Transit Dist.* (1976) 65 Cal.App.3d 121, 132 [135 Cal.Rptr. 192].)

Appellant cites the fact that Holiday had ceased sales of its casino coupons prior to the time of trial as establishing the improper imposition of the injunction. (See *People* v. *National Association of Realtors, supra,* 120 Cal.App.3d 459, 476.) But the record shows that Toomey continued to sell other forms of coupons using many of the same deceptive marketing techniques found objectionable by the court when it issued the preliminary injunction. We also find significant the fact that appellant had failed to comply with the terms of the preliminary injunction, continuing his unlawful business practices in contravention of a court order. Thus, the trial court had good reason to feel that appellant's misleading and unfair trade practices would continue. (*People* v. *Bestline Products, Inc., supra,* 61 Cal.App.3d 879, 907.) Accordingly, the injunctive relief requested by the People was, in our view, properly granted. (*Rosicrucian Fellow* v. *Rosicrucian etc. Ch.* (1952) 39 Cal.2d 121, 144 [245 P.2d 481]; *Gold* v. *Los Angeles Democratic League, supra,* 49 Cal.App.3d 365, 372.)

Next, appellant contends that the permanent injunction is too broad in scope, containing proscriptions against otherwise lawful conduct. Relying

---

[9]Section 17203 states: "Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

\*Reporter's Note: Deleted on direction of Supreme Court by order dated May 4, 1983.

on the rule that injunctions prohibiting a person from engaging in activities which are constitutionally and statutorily authorized are void as beyond the jurisdiction of the court (*In re Berry* (1968) 68 Cal.2d 137, 147 [65 Cal.Rptr. 273, 436 P.2d 273]; *People* v. *Kelly* (1977) 70 Cal.App.3d 418, 422 [138 Cal.Rptr. 681]), appellant cites as overly broad those provisions of the court's order 1) requiring him to establish an impound fund to be used to provide refunds to purchasers; 2) precluding him from selling any product or service to consumers which are to be provided by another party without a valid, binding contract between him and the third party; 3) requiring specified disclosures; 4) prohibiting "an employment relationship or association with any person which (appellant) knows or should know is subject to a court order prohibiting such person from engaging in the activity for which (appellant) may wish to have or associate such person"; 5) barring appellant from using any business name without first notifying the Attorney General's office; 6) mandating the maintenance of records of complaints, refunds and customer correspondence; and 7) requiring appellant to submit to warrantless searches and seizures.

Appellant fails to recognize that the challenged provisions of the permanent injunction are necessary to the objective of preventing future violations. The impound fund and disclosure requirements have an obvious purpose: to deter additional misconduct. The recordkeeping, search and business-name notification provisions are important to monitor appellant's business and thereby encourage compliance with the substantive terms of the judgment. The prohibition against employing a person subject to an injunctive order is based upon appellant's prior hiring of Ernie Alfonso—who at the time was subject to a court-ordered restriction against misleading coupon sales—as a sales manager. And the requirement of a valid binding contract with third party providers of goods or services attempts to solve the problem of casinos failing to honor coupons.

We consider the provisions of the permanent injunction to be properly designed to prevent unfair trade practices and deter appellant and others from future misconduct.

Appellant also argues that the assessment of $150,000 in civil penalties for violations of sections 17200 and 17500—in addition to a $150,000 penalty for violation of the preliminary injunction (§ 17535.5) and restitution (§ 17535)—was excessive as a matter of law. First, appellant complains that the number of violations used as a basis for computing the award was improperly calculated. Second, he submits that the award is not reasonably related to his wealth.

According to section 17206, "[a]ny person who violates any provision of this chapter [section 17200] shall be liable for a civil penalty not

to exceed two thousand five hundred dollars ($2,500) for *each* violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney. . . ." (Italics added.) Section 17536 states identical penalty provisions for each violation of section 17500.[10] Sections 17205 and 17534.5 direct that "the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state."

After calculating the number of solicitations and sales of coupons by Holiday between 1978 and 1981, the trial court determined that appellant committed at least 150,000 violations each of both the preliminary injunction and sections 17200 and 17500. Civil penalties in the amount of $150,000, apparently predicated upon this calculation of violations by the trial court, were imposed.

Appellant complains that the trial court erred by "doubling up" or "piggybacking" the violations; that is, assessing penalties under both sections 17206 and 17536 for a single misleading solicitation. This contention is defeated by sections 17205 and 17534.5, which specifically allow for cumulative remedies, indicating a legislative intent to allow the double fines to which appellant objects. (See *People* v. *Los Angeles Palm, Inc.* (1981) 121 Cal.App.3d 25, 33 [175 Cal.Rptr. 257].)

And we also conclude that the trial court did not err by using the number of sales to calculate the number of corresponding violations. Sections 17206 and 17536 fail to specify what constitutes a single violation, leaving it to the courts to determine appropriate penalties on a case-by-case basis. (*People* v. *Witzerman, supra,* 29 Cal.App.3d 169, 180.) In *Witzerman,* the court declared that the calculation of a single violation "depends on the type of violation involved, the number of victims and the repetition of the conduct constituting the violation—in brief, the circumstances of the case." (*Id.,* at p. 180.)

In *People* v. *Superior Court (Jayhill Corp.)* (1973) 9 Cal.3d 283 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191], book sellers soliciting door-to-door made at least 25 separate misrepresentations to each prospective purchaser. Our high court concluded, however, that each such misrepresentation could not constitute a single violation for purposes of sections

---

[10]Section 17536 states, in subdivision (a): "(a) Any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, or city attorney in any court of competent jurisdiction."

17206 and 17536. The court explained that "it is unreasonable to assume that the Legislature intended to impose a penalty of this magnitude for the solicitation of one potential customer. Rather, we believe the Legislature intended that the number of violations is to be determined by the number of persons to whom the misrepresentations were made, and not the number of separately identifiable misrepresentations involved. Thus, regardless of how many misrepresentations were allegedly made to any one potential customer, the penalty may not exceed $2,500 for each customer solicited by a defendant." (*Jayhill, supra,* at p. 289; see also *People* v. *Bestline Products, Inc., supra,* 61 Cal.App.3d 879, 923; *People* v. *Witzerman, supra,* 29 Cal.App.3d 169, 180.)

The "per victim" basis of calculating violations used in *Jayhill* is also manifestly reasonable in the case of telephone solicitations. Additional violations for the misleading newspaper advertisements can be figured in accordance with the approach employed in *People* v. *Superior Court (Olson)* (1979) 96 Cal.App.3d 181, 198 [157 Cal.Rptr. 628]: "[A] single publication constitutes a *minimum* of one violation with as many additional violations as there are persons who read the advertisement or who responded to the advertisement. . . ." Using a "per victim" formula alone the trial court was fully justified, considering the evidence of sales made by appellant, in finding 150,000 *separate* violations of sections 17200 and 17500. The record reveals that standard solicitations were used by appellant, making each sale the product of one or more misrepresentations.

And appellant's claim that the penalties are improper for lack of a showing of reliance by the purchasers is without merit. As an action designed to protect the public rather than benefit private parties, reliance and actual damages need not be established. "[o]nly the violation of statute is necessary to justify an injunctive relief and civil penalties." (*People* v. *Pacific Land Research Co., supra,* 20 Cal.3d 10, 18, fn. 7; *Hernandez* v. *Atlantic Finance Co.* (1980) 105 Cal.App.3d 65, 72 [164 Cal.Rptr. 279].) Thus, use of a "per victim" formula to find 150,000 violations was not error. (*Jayhill, supra,* 9 Cal.3d 283; *Witzerman, supra,* 29 Cal.App.3d 169.)

Once the trial court arrived at a figure of 150,000 violations, it imposed a penalty of only $1 per violation. When compared with the maximum possible fine of $2,500 per violation, the trial court's assessment was reasonable, if not lenient. This is particularly so given the great number of victims, the economic benefit to appellant from the marketing scheme, and the continuing nature of the unlawful business practices. We therefore conclude that the trial court did not assess civil penalties disproportionate to appellant's wealth or otherwise abuse its discretion by fining appellant $150,000 for violations of sections 17200 and 17500.

Appellant also contests the award of $150,000 for violation of the preliminary injunction. According to sections 17207 and 17535.5, any person who intentionally violates an injunction issued pursuant to sections 17203 and 17535, respectively, "shall be liable for a civil penalty not to exceed six thousand dollars ($6,000) for each violation." Each section then states: "In determining the amount of the civil penalty, the court shall consider all relevant circumstances, including, but not limited to, the extent of the harm caused by the conduct constituting a violation, the nature and persistence of such conduct, the length of time over which the conduct occurred, the assets, liabilities and net worth of the person, whether corporate or individual, and any corrective action taken by the defendant." The factors to be relied upon by the court in calculating the appropriate penalty for violation of an injunction are thus specifically stated in the governing statutes.

Appellant insists that the award made by the trial court was arbitrarily based upon "passion and prejudice" rather than the statutory factors. We consider this contention specious, given the justified finding of 150,000 violations, and particularly in light of the repeated and continuing misconduct in direct contravention of the court's order.

Toomey next claims that the award was disproportionate to his wealth in violation of sections 17207 and 17535.5. He suggests that civil penalties under the unfair business practices act are akin to punitive damages, and therefore the amount of the award must be related to the defendant's wealth. He also argues that the People failed to produce sufficient evidence of his wealth, particularly a profit and loss statement for Holiday, which makes the award improper.

 It has been held that the penalty provisions of the unfair business practices act are "sufficiently similar to exemplary damages as to permit discovery of the defendant's financial condition in appropriate cases." (*People* v. *Superior Court (Kardon)* (1973) 35 Cal.App.3d 710, 713 [111 Cal.Rptr. 14].) Sections 17207 and 17535.5 expressly direct the court to consider the "liabilities, and net worth of the person" in determining the amount of the civil penalty.

Exemplary damages must not be "disproportionate in relation to the net worth of the defendant." (*Zhadan* v. *Downtown L.A. Motors* (1976) 66 Cal.App.3d 481, 498 [136 Cal.Rptr. 132].) The wealth of the particular defendant is to be considered in determining the appropriate amount of an exemplary damages award. (*Roemer* v. *Retail Credit Co.* (1975) 44 Cal.App.3d 926, 937 [119 Cal.Rptr. 82].) In *Kardon,* the court noted that civil penalties under the unfair business practices act "act as a deterrent" against similar misconduct by the defendant and others, much like exem-

plary damages, making the financial condition of the defendant relevant in assessing such penalties. (35 Cal.App.3d 710, 713.) The court added: "A relatively small penalty might suffice for the small operator, while the same penalty would be paid with little hurt by the wealthy one." (*Ibid.*)

Thus, appellant's wealth has a bearing on the propriety of the award. It appears from the record, however, that the trial court took account of this factor. The People submitted evidence showing deposits by Toomey in various banks between 1979 and 1981 in excess of $800,000. And Toomey owned additional property and assets of which the court was made aware.

Toomey complains that the court did not receive evidence of his *personal* net worth, other than his salary of $3,500 per month from Holiday, and thus had no basis for comparing the civil penalties to his wealth. But while no showing of Toomey's net assets was made by the People, evidence of Holiday's sales and profits was introduced, and Toomey was established as the sole operator of the business. The lack of any further showing of appellant's wealth does not defeat the award; rather, recent decisions indicate that the burden is on the defendant to establish financial inability to pay an exemplary damage award (*Vossler* v. *Richards Manufacturing Co.* (1983) 143 Cal.App.3d 952, 963 [192 Cal.Rptr. 219]), and appellant failed to assist the trial court by providing requested financial information. We find that, based upon the evidence presented to the trial court, the award was not disproportionate to appellant's wealth. And considering all of the factors enumerated in sections 17203 and 17535, the civil penalties of $150,000 for the statutory violations and an additional $150,000 for violation of the preliminary injunction were neither arbitrary nor the result of passion and prejudice.

Appellant also argues that restitution was improperly ordered by the trial court. The flaw in the order requiring restitution to all coupon purchasers, according to appellant, is its inclusion of those who neither testified at trial nor were shown to have relied on the misrepresentations. Appellant would limit restitution only to purchasers who appear at trial and request a refund.

Sections 17203 and 17535 specifically authorize the court to order defendant "to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any [unlawful practice]." Since the unlawful business practices act seeks to protect the public from continued violations rather than benefit private litigants (*People* v. *Pacific Land Research Co., supra,* 20 Cal.3d 10, 17; *People* v. *Superior Court (Olson), supra,* 96 Cal.App.3d 181, 1960), reliance and actual damages are not necessary elements to an award under sections 17203 and 17535 (*Hernandez* v. *Atlantic Finance Co., supra,* 105 Cal.App.3d 65, 72). Res-

titution is not intended to benefit the tendees by the return of money, but instead is designed to penalize a defendant for past unlawful conduct and thereby deter future violations. (*Pacific Land Research Co., supra,* at p. 17.) Reliance has no place in this legislative scheme. The evidence shows that misrepresentations and nondisclosures were standard practice in appellant's business. All purchasers were misled, and the public as a whole was deceived. The trial court was fully justified in ordering restitution to all purchasers.

■ Finally, appellant contends that the Attorney General had no standing to seek restitution or other relief for consumers under the home solicitation sales act (Civ. Code, § 1689.5 et seq.). This contention is patently without merit. The unfair practices act defines "unlawful competition" (§ 17200) to include any business activities which violates any other provision of law, such as the home solicitation sales act. (See *People* v. *McKale* (1979) 25 Cal.3d 621, 632 [159 Cal.Rptr. 811, 602 P.2d 731]; *People* v. *E.W.A.P., Inc., supra,* 106 Cal.App.3d 315, 318-319.) Thus, the Attorney General was entitled to seek restitution under the unfair business practices act for violations of the home solicitation sales act. (*Ibid.*) And the home solicitation sales act itself provides for restitution upon *request* within the three-day period, which is all the judgment decrees. (Civ. Code, §§ 1689.6, 1689.7.)

The judgment is affirmed.

Racanelli, P. J., and Holmdahl, J., concurred.