[No. A035487. First Dist., Div. Five. Feb. 17, 1988.]

THE PEOPLE ex rel. ARLO SMITH, as District Attorney, etc., Plaintiff and Respondent, v.
PARKMERCED COMPANY et al., Defendants and Appellants.

684

## COUNSEL

Richard J. Kilmartin and Knight, Boland & Riordan for Defendants and Appellants.

Arlo Smith, District Attorney, Steven J. Castleman and Robert H. Perez, Assistant District Attorneys, for Plaintiff and Respondent.

## OPINION

HANING, J.—Defendants/appellants Parkmerced Company and Parkmerced Management Corporation appeal a judgment in favor of plaintiff/respondent People of the State of California in respondent's action for violation of Civil Code section 1950.5[1] governing rental and lease deposits. Respondent brought its action in response to appellants' imposition of fees additional to the monthly rental charged each tenant of appellants' apartment complex. Appellants contend section 1950.5 does not prohibit landlords from receiving nonrefundable security deposits, that section 1950.5 is unconstitutional on its face, that the trial court abused its discretion in assessing civil penalties, and that it erred in ordering a refund of securities to a tenant organization rather than to the state. We affirm.

---

[1] Unless otherwise indicated, all further statutory references are to the Civil Code.

The Parkmerced Company owns, and Parkmerced Management Corporation operates, an apartment complex consisting of 3,484 rental units. Tenants have one-year leases for which they pay an annual rental in 12 monthly installments, due in advance on the first day of each month. Each lease provides for a security deposit equal to the second month's rent. In addition, appellants charge a $65 increment to each new tenant's first month's rent. For example, a tenant having an annual rental of $3,665 pays $365 the first month and $300 for each of the remaining 11 months. Appellants also charge tenants who move from one apartment to another within the complex a $50 transfer charge. Both the $65 increment and the $50 transfer charge are nonrefundable.

The collection and use of security deposits in residential leases is governed by section 1950.5. This section states, in relevant part: "(b) As used in this section, 'security' means any payment, fee, deposit or charge, including, but not limited to, an advance payment of rent, used or to be used for any purpose, including, but not limited to, any of the following: [¶] (1) The compensation of a landlord for a tenant's default in the payment of rent. [¶] (2) The repair of damages to the premises, exclusive of ordinary wear and tear, caused by the tenant . . . . [¶] (3) The cleaning of the premises upon termination of the tenancy. [¶] (4) To remedy future defaults by the tenant in any obligation under the rental agreement to restore, replace or return personal property or appurtenances, exclusive of ordinary wear and tear, if the security deposit is authorized to be applied thereto by the rental agreement. [¶] (c) A landlord may not demand or receive security, however denominated, in an amount or value in excess of an amount equal to two months' rent, in the case of unfurnished residential property . . . in addition to any rent for the first month paid on or before initial occupancy. . . . [¶] (e) The landlord may claim of the security only those amounts as are reasonably necessary for the purposes specified in subdivision (b). [¶] (f) Within two weeks after the tenant has vacated the premises, the landlord shall furnish the tenant . . . an itemized statement indicating the basis for, and the amount of, any security received and the disposition of the security and shall return any remaining portion of the security to the tenant. [¶] . . . [¶] (k) The bad faith claim or retention by a landlord . . . of the security or any portion thereof, in violation of this section . . . , may subject the landlord . . . to damages not to exceed ($200), in addition to any actual damages . . . . In any action under this section, the landlord . . . shall have the burden of proof as to the reasonableness of the amounts claimed or the authority pursuant to this section to demand additional security deposits. [¶] (*l*) No lease or rental agreement shall contain any provision characterizing any security as 'nonrefundable.'"

In bringing the instant action respondent contended that the $65 first month's increment and the $50 transfer fee were securities unlawfully re-

tained in violation of section 1950.5. The trial court determined that both fees contravened section 1950.5 and that appellants' retention thereof constituted an unlawful business practice. It permanently enjoined appellants from charging such fees, and required them to include in future leases or renewal agreements a notice informing tenants of their rights under section 1950.5. It further ordered appellants to reimburse the fees with interest to all tenants who had vacated the premises, notify all remaining tenants of their right to a refund, and pay to the Parkmerced Residents' Organization the refunds of former tenants whom appellants could not locate after a good faith effort to do so, "for use by the Residents' Organization in representing the interests of [appellants'] tenants." Finally, it ordered appellants to pay $221,700 in civil penalties and $40,000 attorney fees.

With diverse emphasis, both parties cite *Granberry* v. *Islay Investments* (1984) 161 Cal.App.3d 382 [207 Cal.Rptr. 652]. In *Granberry* the landlord rented apartments for an initial term of 31 days. If the tenant elected to continue renting the apartment, the subsequent monthly rent was reduced. A tenant brought suit on the ground that the practice of charging more for the first month's rent violated section 1950.5. The trial court granted summary judgment for the landlord, concluding that the increased first month's rent was rent in fact, and not a security as defined by section 1950.5. The trial court defined security "as a payment for 'something in the future not yet earned by the lessor or damage not yet sustained by him.'" (*Id.,* at p. 389.) The appellate court concluded the trial court defined "security" too narrowly, and reversed. It remanded for a determination whether the first month's rent differential was actually rent or merely a refundable security deposit.

■ Appellants conceded that the $50 transfer fee was never considered to be rent, but rather a fee to cover administrative costs. As to the $65 increment, there is substantial evidence that neither appellants nor tenants considered it rent, despite its being included with the first month's rental payment. Tenants and former tenants variously testified that they were told the $65 fee was a cleaning fee, an administrative fee, a processing fee, or a move-in fee, or they were not given an adequate explanation of its purpose. Appellants testified the fee was to recover some of the "front-end" costs of moving in a new tenant; that it was not considered when calculating rent increases pursuant to the local rent control ordinance; that they charged the increment rather than raising the security deposit or creating a cleaning fee deposit because that would have required them to account to the tenants; that the $65 fee was constant regardless of the size of the apartment; that advertising brochures describing rental fees did not disclose the $65 first month's increment; and that the $65 fee was differentiated from rent in internal accounting records. Appellants analogized it to the $50 transfer fee:

its purpose was to recover certain front-end costs, such as cleaning, advertising and showing the apartment, checking credit references, and the like. Thus, we have substantial evidence to support the trial court's finding that the deposits herein were not for rent or any other purpose permitted by section 1950.5.

■ Section 1950.5 defines "security" "as *any* payment, fee, deposit or charge . . . used or to be used for *any* purpose" in a rental agreement. That "security" is intended to have a broad definition can be seen in a comparison of the present section 1950.5 to the one it replaced. ■ When the Legislature enacts a new law on the same subject as a prior law or makes a material amendment or change to an existing statute, we presume a legislative purpose to change existing law. (See *Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 231 [273 P.2d 5]; *Union League Club* v. *Johnson* (1941) 18 Cal.2d 275, 278 [115 P.2d 425].) ■ The original section 1950.5 applied to "[a]ny payment or deposit of money the *primary* function of which is to secure the performance of a rental agreement . . . other than a payment or deposit . . . made to secure the execution of a rental agreement . . . ." The legislative history of the current section 1950.5 indicates that the reason for changing the language to "any payment . . . for any purpose" was to eliminate any distinctions between payments or deposits based upon their primary function. The change was also to expand the security deposit law to apply not only to payments made to secure performance, but also to secure execution of the lease.[2]

■ In short, section 1950.5 permits collection of limited security deposits, but restricts the use thereof to specifically defined purposes. Any portion of such deposits not "reasonably necessary for the purposes specified in subdivision (b) [of section 1950.5]" must be refunded to the tenant. (§ 1950.5, subd. (e).)

---

[2] The Legislative Counsel's Digest of Assembly Bill No. 94 (3 Stats. 1977 (Reg. Sess.) Summary Dig., p. 253) notes that the old statute made no "provision for those payments or deposits of money . . . the primary function of which is to secure the execution of a rental agreement. . . . [¶] This bill would define security as inclusive of any payment, fee, deposit, or charge, thereby eliminating the distinction between payments or deposits based upon their primary function. This bill would specifically provide that an advance payment of rent may operate as security."

The Assembly Office of Research, third reading analysis of Assembly Bill No. 94 (1977 Reg. Sess.) comments that the bill "amends the existing security deposit law so that it applies to payments or deposits made to secure execution of the lease as well as deposits made to secure performance. [¶] A deposit made to secure performance is one which is made to guarantee that the specific terms of the contract will be carried out once the tenant takes occupancy under the lease. On the other hand, a payment or deposit which is made to secure the execution of the contract is normally either an amount paid in advance as consideration for entering into the contract or a deposit which will be applied to the first month's rent if the prospective tenant takes occupancy but which will be forfeited if he or she does not."

Since neither the $65 new tenant fee nor the $50 transfer fee were applied to any of the purposes permitted by subdivision (b) of section 1950.5, they were required to be refunded. ■ Appellant contends section 1950.5 is unconstitutionally vague because the definition of "security" is so broad it encompasses every payment a tenant makes. ■ " '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' " (*People* v. *Barksdale* (1972) 8 Cal.3d 320, 327 [105 Cal.Rptr. 1, 503 P.2d 257], citing *Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) Statutes "must be sufficiently clear as to give a fair warning of the conduct prohibited, and must provide a standard or guide against which conduct can be uniformly judged by courts and administrative agencies. [Citation.]" (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375].) However, "reasonable certainty is all that is required" (*In re Marriage of Walton* (1972) 28 Cal.App.3d 108, 116 [104 Cal.Rptr. 472]), and statutes must be interpreted, if possible, to preserve their constitutionality. (*Department of Corrections* v. *Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 197, 207 [152 Cal.Rptr. 345, 589 P.2d 853].)

■ The *Granberry* court did not address the constitutional issue, but we agree with their observation that the statute is no model of clarity. (7) However, the primary rule of statutory construction is to "ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining such intent '[t]he court turns first to the words themselves for the answer.' [Citation.] We are required to give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.] 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' [Citation.] '[A] construction making some words surplusage is to be avoided.' [Citation.] 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]" (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230-231 [110 Cal.Rptr. 144, 514 P.2d 1224].) "[T]he literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole. [Citation.]" (*Silver* v. *Brown* (1966) 63 Cal.2d 841, 845-846 [48 Cal.Rptr. 609, 409 P.2d 689].)

■ The general purpose of section 1950.5 is to limit the amount and use of security deposits in residential leases. The total security which can be collected is limited to an amount equal to two months' rent for unfurnished units, and three months' rent for furnished units, in addition to the first month's rent. This limitation does not prohibit "an advance payment of not less than six months' rent where the term of the lease is six months or longer." (§ 1950.5, subd. (c).)

However, regardless of the amount collected, "[t]he landlord may claim of the security only those amounts as are reasonably necessary to remedy tenant defaults in the payment of rent, to repair damages to the premises caused by the tenant, exclusive of ordinary wear and tear, or to clean such premises, if necessary, upon termination of the tenancy." (§ 1950.5, subd. (e).) The language and purpose of the statute require that any remaining portion must be refunded.

■ Appellants next contend that the assessment of $221,700 in civil penalties was an abuse of discretion. Pursuant to Business and Professions Code section 17206, persons committing unfair business practices "shall be liable for a civil penalty not to exceed ($2,500) for each violation . . . ." The trial court found that 4,259 tenants paid the $65 increment between January 1, 1978 (the day present § 1950.5 went into effect) and the time of trial. It found 175 tenants paid the $50 transfer fee between January 1, 1978 and June 18, 1981, when appellants ceased charging it. The trial court did not specify how it determined the civil penalty, but dividing the total assessment by the number of tenants paying the fees equals $50 per tenant. Violations may be calculated on a "per victim" basis. (*People* v. *Superior Court (Jayhill Corp.)* (1973) 9 Cal.3d 283, 289 [107 Cal.Rptr. 192, 507 P.2d 1400, 55 A.L.R.3d 191]; *People* v. *Toomey* (1985) 157 Cal.App.3d 1, 23 [203 Cal.Rptr. 642].) In view of the fact that appellants have not claimed the award was disproportionate to their wealth or ability to pay, and considering that they continued charging the $65 increment until trial despite being aware since 1980 that the district attorney was investigating their practice, we see no abuse of discretion. (See *People* v. *Toomey, supra.*)

■ Appellants finally contend the trial court erred in ordering that security deposits which could not be returned to affected tenants because they could not be located should be paid to the Parkmerced Residents' Organization. Code of Civil Procedure section 1519.5 provides that any sum held by a business association which a court has ordered refunded escheats to the state if the sum has remained unclaimed for more than one year. The statute also states that "it is the intent of the Legislature that nothing in this section shall be construed to change the authority of a court

. . . to order equitable remedies."[3] When this statement of legislative intent is read in connection with Business and Professions Code sections 17200 and 17203, by which the Legislature gave trial courts wide equitable powers to rectify unlawful business practices, it is clear the Legislature did not intend that the sole recourse of courts dealing with unclaimed property is to order it to escheat to the state. "In the absence of such a restriction a court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties . . . ." (*People* v. *Superior Court (Jayhill Corp.)*, supra, 9 Cal.3d at p. 286.)

Although the residents organization was not a party to this action, it took a continuing interest in the matter, assisted the district attorney in gathering pertinent information, and had a vested interest in its outcome. Refunding the unclaimed securities to the organization for its use in representing the interests of the Parkmerced tenants is an appropriate disposition of the penalty funds.

Affirmed.

Low, P. J., concurred.

KING, J.—I concur, but cannot do so without recommending to the Legislature that it redraft Civil Code section 1950.5. The majority's observation that this statute is "no model of clarity" is a gross understatement. As Justice Gilbert said in *Granberry* v. *Islay Investments* (1984) 161 Cal.App.3d 382 [207 Cal.Rptr. 652], this statute "teeter[s] on the brink of unintelligibility." The only reason it still teeters is because of judicial efforts to keep it alive, and these efforts have been considerable.

When Justice Gilbert must begin an opinion by saying "here we attempt to make sense out of Civil Code section 1950.5," the Legislature should realize there is a problem. When our colleague uses such language as "to further confound anyone trying to make sense out of the statute" and states that a literal reading of the statute would lead to "an absurd result," it becomes clear the Legislature has a mandate to redraft the statute.

This is not a statute that is infrequently utilized. With the possible exceptions of relationships between husbands and wives and employees and em-

---

[3] In pertinent part Code of Civil Procedure section 1519.5 states: "[A]ny sums held by a business association that have been ordered to be refunded by a court or an administrative agency . . . which have remained unclaimed by the owner for more than one year after becoming payable in accordance with the final determination or order providing for the refund, whether or not the final determination or order requires any person entitled to a refund to make a claim for it, escheats to this state. [¶] . . . [¶] Further, it is the intent of the Legislature that nothing in this section shall be construed to change the authority of a court or administrative agency to order equitable remedies."

ployers, no relationship occurs more frequently in California than that of landlords and tenants. For this reason, the Legislature has a duty to provide statutory language governing this relationship which can be clearly understood by the affected persons. In its present form, laymen trying to read and understand this statute must easily identify with the experiences Alice found in Wonderland.

A petition for a rehearing was denied March 10, 1988, and appellants' petition for review by the Supreme Court was denied May 19, 1988. Kaufman, J., was of the opinion that the petition should be granted.